**In re G. G. KOSSOW, Appellant.**

**In re Reginald F. RUBAIN, Appellant.**

**In re Thurman Mathews MURPHY, Appellant.**

**Nos. 11954, 12076, 12077 and 12960.**

District of Columbia Court of Appeals.

Argued Jan. 24, 1978.

No. 12960 submitted March 27, 1978.

Decided Oct. 2, 1978.

Robert P. Mosteller, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom and Alan F. Greenwald, Washington, D. C., were on brief, for appellants in Nos. 11954, 12076, and 12077.

Robert P. Mosteller and Silas J. Wasserstrom, Public Defender Service, Washington, D. C., were on brief, for appellant in No. 12960.

David A. Martin, Washington, D. C., appointed by this court as amicus curiae, with whom Joel I. Klein, Washington, D. C., was on brief, for appellees in Nos. 11954, 12076, and 12077.

Before NEBEKER, HARRIS and FERREN, Associate Judges.

FERREN, Associate Judge:

These consolidated appeals present one question: when the Corporation Counsel elects not to proceed with the judicial stage of an involuntary civil commitment proceeding, may the court permit the private petitioner, through his or her counsel, to press the case for commitment? Appellants argue that private petitioners lack legal capacity to pursue the case beyond their presentation to the Commission on Mental Health—that the decision to seek someone's involuntary confinement to a hospital, upon recommendation of the Commission, is exclusively within the discretion of the prosecuting authority. Absent the prosecutor's decision to proceed, appellants say, "the case must come to an end." We disagree and thus affirm.[1]

I. *Background of Each Case*

Elizabeth Kossow filed a petition for the involuntary hospitalization of her son, appellant Gerald G. Kossow, on November 15, 1976, D.C.Code 1973, § 21-541. Mrs. Kossow averred, in the words of the statute, that Mr. Kossow was "mentally ill and likely to injure himself or others" because of his tendency to address her in an obscene and abusive manner, as well as to assault her. She pointed out, further, that appellant had a history of mental illness and hospitalization.

The requisite hearing before the District of Columbia Commission on Mental Health (the "Commission") on January 25, 1977, resulted in a recommendation of commitment to St. Elizabeths Hospital with outpatient release as long as appellant continued to report for treatment. Appellant thereupon demanded his statutory right to jury trial. D.C.Code 1973, § 21-544. The Corporation Council declined to pursue the case, but Mrs. Kossow decided to do so herself, represented by retained counsel. Her son, represented by attorneys from the Public Defender Service, filed a motion to dismiss on the ground that a private party lacks legal capacity to "prosecute" civil commitment proceedings. The trial court denied appellant's motion and the hearing went forward on February 7 and 11, 1977, although appellant voluntarily absented himself from a substantial portion of the proceedings.

Dr. Murphy of the Commission staff testified that appellant was schizophrenic and potentially dangerous. The jury found that

1. We wish to express our appreciation to the law firm of Rogovin, Stern & Huge, which participated as *amicus curiae* by appointment of the court.

appellant was mentally ill and likely to injury himself or others. The trial court denied appellant's post-trial motion for judgment n. o. v. based on the same ground as the motion to dismiss. On February 24, 1977, the trial court held a dispositional hearing, then committed Gerald Kossow to St. Elizabeths "for an indefinite period."

Mabel F. Rubain similarly petitioned for judicial hospitalization of her 30-year-old son, appellant Reginald Rubain, on March 8, 1976. Her supporting affidavit stated that appellant had a history of mental instability (schizophrenia) and related hospitalization, and that—among other behaviors—he had set fires in trash cans in the house, broken plaster off the walls looking for money, talked of getting guns, dressed in sheets and towels, and watched television without the sound. After a hearing on March 18, 1976, the Commission recommended that the court dismiss the petition because all parties had agreed to dismissal based on Reginald Rubain's willingness to undergo voluntary treatment. Apparently, however, he failed to appear for a scheduled hearing shortly thereafter. A new report by the Commission on April 15, 1976, found Mr. Rubain to be "suffering from schizophrenia, Chronic Undifferentiated Type," and stated that he was likely to injure himself and others if allowed to remain at liberty." The Commission accordingly recommended indefinite commitment to St. Elizabeths and set the matter for hearing in Superior Court on April 23.

The trial court appointed the Corporation Counsel to represent the petitioner, Mrs. Rubain, but on April 26, 1976, the Corporation Counsel appealed to this court challenging the validity of that appointment. The commitment hearing was accordingly delayed pending resolution of the appeal, which itself was held in abeyance pending decision of the same issue in another case. *District of Columbia v. Pryor,* D.C.App., 366 A.2d 141 (1976). Once *Pryor* had been decided in the Corporation Counsel's favor, we dismissed the appeal in this case on December 13, 1976. As a result, the Corporation Counsel was no longer in the case. The Commission then held another hearing on

December 21, when it reconfirmed its findings of April 15, as well as its recommendation of indefinite hospitalization. Appellant then requested a jury trial.

On January 14, 1977, the trial court appointed a private attorney to represent the petitioner, Mrs. Rubain. After an unsuccessful motion by appellant to vacate the appointment and dismiss the action, as well as a similarly fruitless motion to this court for a stay pending appeal of the denial, the court conducted a jury trial on February 14, 1977. Mrs. Rubain and her appointed counsel assumed responsibility for conducting the proceeding in support of her petition. Dr. Murphy of the Commission staff testified that Reginald Rubain was schizophrenic and potentially dangerous. The jury then found Mr. Rubain to be "mentally ill" and "likely to injure himself or others if allowed to remain at liberty."

On March 16, 1977, the judge committed appellant Rubain to St. Elizabeths "for an indefinite period." Later he denied motions for judgment n. o. v. and for a new trial. Both denial orders have been appealed. We agreed to consolidate them with Mr. Kossow's appeal from his commitment order.

Finally, in a petition filed October 19, 1977, Thurman F. Murphy, father of appellant Thurman Mathews Murphy, sought judicial hospitalization of his son. In the accompanying affidavit, the petitioner related that appellant sleeps during the day and stays up at night; that he "messes up food to the extent that we have to shop daily"; that he hooks up wires to electrical outlets; that his family has to "lock up . . . all personal articles especially medicine" because appellant "takes it"; that appellant threatens to "tear up everything" in the house and car; that he was apprehended at Fort Belvoir when found sleeping in an abandoned building, whereupon he asserted that he was there to plant land mines; that in 1974 he was involved in an automobile accident in which a young lady was killed, and that a month before the time of the petition, when he heard another woman on the street near the fami-

ly home referred to by the same name as the decedent, he started chasing her, "asking why she stayed away from him so long, and threatening to kill her"; and, finally, that he had "mentioned sex with our 16-year-old daughter."

The Commission, after hearing particularized evidence of much bizarre behavior, concluded that appellant Murphy was "suffering from Schizophrenia, Paranoid Type and [was] likely to injure himself and others if allowed to remain at liberty." The Commission, therefore, recommended indeterminate judicial hospitalization. Appellant requested a jury trial. On December 5, 1977, the court denied a motion to dismiss the case based on the same contentions now raised in these appeals. Thereafter, appellant apparently waived his jury right. After trial, on December 21, 1977, the court found appellant mentally ill and likely to injure himself or others. Pending a dispositional hearing set for January 13, 1978, appellant was committed to St. Elizabeths. Prior to that hearing, he brought this appeal.[2]

## II. *The Statutory Civil Commitment Scheme*

■ Appellants make two statutory arguments: (1) the 1964 revision of the District of Columbia's civil commitment laws precludes private prosecution, as evidenced by deletion of a reference in the prior statute to a petitioner's use of private counsel, as well as by the overall policies of the 1964 legislation; and (2) the civil commitment scheme is analogous to, and thus should be held to emulate, the criminal and juvenile law systems which preclude prosecution by a private party, absent participation by a public prosecutor. We find neither argument persuasive.

2. After oral argument in the Kossow and Rubain appeals had taken place on January 24, 1978, appellant Murphy moved to consolidate his appeal in No. 12960 with the appeals of Messrs. Kossow and Rubain. The motion was unopposed and was granted by the present division, which ordered that "it shall be treated as submitted on the briefs heretofore filed in

In 1964, Congress comprehensively reformed the District's civil commitment scheme by adopting the "District of Columbia Hospitalization of the Mentally Ill Act," P.L. No. 88–597, 78 Stat. 944 (1965) (the "Ervin Act") now codified in D.C.Code 1973, §§ 21–501 *et seq.* The Ervin Act omitted the following provision of the prior statute:

> In any case in which a commitment at public expense, in whole or in part, is sought, the corporation counsel or one of his assistants shall represent petitioner unless said petitioner shall be represented by counsel of his or her own choice. [D.C. Code 1961, § 21–312.]

The legislative history of the Ervin Act furnishes no explanation for this deletion. *See District of Columbia v. Pryor, supra* at 143.

Appellants urge that because material amendments to the language of an original act ordinarily must be presumed to change legal rights, *see* 1A Sutherland, Statutory Construction § 22.30 (Sands 4th Ed. 1972), we must conclude that the authority for private litigation has been repealed.[3] In making our analysis, however, we believe it appropriate to avoid using canons of statutory construction; for every canon, one can find an applicable countercanon. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed,* 3 Vand. L.Rev. 395, 401–06 (1950). Our job is to try to make the best sense we can out of statutory revisions that are not entirely clear.

It is true that the repealed § 21–312 contemplated "that a petitioner . . . would not be required to rely upon the assistance of the Corporation Counsel, but could secure counsel of her own choice." *In re Colohan,* 93 F.Supp. 641, 642 (D.D.C. 1950). Yet, as we read the statute, the thrust of § 21–312 was not so much the

appeal Nos. 11954, 12076, and 12077, without further oral argument.

3. We prefer the *amicus'* choice of the more neutral term "private litigation" over appellants' use of "private prosecution" to describe the role of petitioner, since appellants' terminology provides a gloss that may not be accurate.

authorization of private participation as it was the provision of government counsel for petitioners who lacked private representation. Accordingly, while deletion of this § 21–312 language repealed statutory authorization for court appointment of government counsel, *District of Columbia v. Pryor, supra,* we cannot say with equal certainty that the deletion repudiated, in addition, the common practice of permitting private petitioners to litigate involuntary civil commitments with the help of their own counsel.

Necessarily, in repealing the § 21–312 obligation of the Corporation Counsel to represent a petitioner, Congress had to repeal the entire sentence, including the "unless" clause. We cannot read statutory significance into the Congressional failure to rewrite the "unless" clause into positive law. Given the practice of private civil commitment litigation, we believe that it would be more reasonable to conclude that Congress assumed private parties would continue to litigate civil commitments than it would be to conclude that such litigation would abruptly end if the government attorney opted out. We conclude that the repeal of the contested provision in D.C. Code 1961, § 21–312, adds no force to appellants' argument.[4]

█ We also reject appellants' more pervasive contention that the overall policies of the Ervin Act mandate the absence of private petitioner-litigants. We do recognize that the primary motivation behind the

1964 reform of procedures for voluntary and involuntary hospitalization of the mentally ill was to guarantee the protection of constitutional rights. *See* S.Rep.No. 925, 88th Cong., 2d Sess. (1964); H.R.Rep.No. 1833, 88th Cong., 2d Sess. (1964); 110 Cong. Rec. 14552, 88th Cong., 1st Sess. (1963) (remarks of Sen. Ervin). In acknowledging this reform goal, however, we cannot overlook the other, sometimes conflicting objectives which the overall commitment scheme attempts to reconcile: protection *and treatment* of mentally ill individuals, as well as protection of the public. *See Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 325, 427 F.2d 589, 595 (1970); *Covington v. Harris,* 136 U.S.App.D.C. 35, 43, 419 F.2d 617, 625 (1969). *See generally, Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1189, 1285 n.124, 1288 (1974) (hereafter *Civil Commitment*). Absent specific statutory direction, therefore, we have no basis for concluding as a matter of statutory construction that private civil commitment litigation necessarily undermines the Ervin Act reforms balancing all the interests at stake.[5]

Finally, appellants' analogy of civil commitment to the criminal and quasi-criminal juvenile law systems does not establish appellants' position. Criminal prosecution, it is true, is generally considered to be a matter of executive branch discretion. *See* D.C.Code 1973, § 23–101; *Newman v. United States,* 127 U.S.App.D.C. 263, 382 F.2d

---

4. The very structure of the civil commitment process reinforces our conclusion that the Ervin Act leaves room for private participation. Once the Commission makes a commitment recommendation and tenders the requisite report to the court under D.C.Code 1973, § 21–544, the court automatically schedules a hearing. D.C.Code 1973, § 21–545. There is no provision for the prosecuting authorities to negate the recommendation, let alone abort the process by declining to involve itself. Arguably, therefore, the commitment hearing must occur with or without the assistance of a government attorney or other proponent of hospitalization (other than the Commission itself). While this structural aspect does not necessarily confirm an intent to permit private litigation—theoretically, the court could conduct the hearing on its own—we read it as

additional evidence of continued acceptance of the private-party practice under the previous statute.

5. Nor do we find support for appellants' position in the Superior Court Mental Health Rules. The fact that Rule 5(a) places the burden of proof on the government does not, by negative implication, preclude private participation to facilitate the governmental determination by jury and trial court. Likewise, Rule 11(c), limiting access to Commission transcripts, does not address the issue of proper parties to a proceeding. In any event, family members—the most likely private petitioners—are granted access to such transcripts, and the trial court is empowered to extend access to others.

479 (1967).[6] Similarly, government officials are specifically charged with initiating and pursuing all juvenile proceedings. D.C. Code 1973, § 16–2305. The same is not pervasively true, however, in the civil commitment field. Many states, like the District of Columbia, do not expressly mandate participation of a public attorney at the judicial stage of civil commitment proceedings. *See Civil Commitment, supra.* These states, therefore, arguably permit civil commitment advocacy by private petitioners.[7]

■ Although confinement and other deprivations which result from the civil commitment and criminal-juvenile processes, respectively, provide points of similarity, the fundamentally different natures and goals of the criminal justice and civil commitment systems have led to the adoption of different procedures overall for these systems in the District of Columbia and elsewhere. *See Dixon v. Jacobs, supra,* 138 U.S.App.D.C. at 325, 427 F.2d at 595. We cannot say, therefore, that the required use of government prosecutors in the criminal-juvenile context should be deemed to indicate a Congressional intent to require such prosecutors for civil commitments, let alone to preclude private litigation in the commitment field.[8]

We conclude that appellants cannot establish their case on statutory grounds.

### III. *Due Process*

Appellants maintain that under the due process clause of the Fifth Amendment the only advocate permitted to press civil commitment at the judicial stage is a public representative of the executive branch. Referring, once again, to the similarities between the criminal and civil commitment schemes—including their respective consequences—appellants contend that the constitutional mandate of fundamental fairness necessitates the use of a "public prosecutor" in the civil commitment process; otherwise, the process must come to an end, despite the Commission's recommendation. After evaluating the respective interests at stake and applying the accepted due process criteria, we have concluded, contrary to appellants' claim, that the Constitution permits the judicial stage to proceed without a public litigant—and with a private advocate.

■ Because liberty is jeopardized by the civil commitment procedure, there can be no doubt that the demands of due proc-

---

**6.** Even in the criminal realm, however, some jurisdictions have continued to permit private attorneys, retained by complainants, to participate alongside a public prosecutor. *State v. Best,* 280 N.C. 413, 186 S.E.2d 1 (1972); *Powers v. Hauck,* 399 F.2d 322 (5th Cir. 1968). One court, in 1913 dicta, approved private prosecution for criminal contempt, even without a public prosecutor being present. *Phillips Sheet & Tin Plate Co. v. Amalgamated Ass'n of Iron, Sheet & Tin Workers,* 208 F. 335 (S.D.Ohio 1913). The Missouri Supreme Court, however, recently has forbidden all private participation in criminal cases, holding it "fundamentally unfair" but observing that such participation is still the "general rule." *State v. Harrington,* 534 S.W.2d 44, 48, 49 (Mo.1976) (en banc). *See generally, Private Prosecution—the Entrenched Anomaly,* 50 No.Car.L.Rev. 1171 (1972).

**7.** At least nine states do apparently grant public attorneys an exclusive role as the proponent of civil commitment. Fla.Stat.Ann. § 394.-467(3)(a) (West Supp.1977); Mont.Rev.Codes Ann. § 38–1305 (Supp.1975); Nev.Rev.Stat. § 433A.270 (1977); S.D. Compiled Laws Ann. § 27A–9–4 (1976); Tex.Rev.Civ.Stat.Ann.Art.

5547–13 (Vernon 1958 and Supp.1977); Wash. Rev.Code § 71.05.130 (1976); Wisc.Stat.Ann. § 51.20 (West Supp.1977); Wyo.Stat. § 25–60(c) (1967).

At least five states expressly permit counsel for private petitioners to conduct civil commitment proceedings. Ala.Code tit. 45, § 230(9) (Interim Supp.1975); Haw.Rev.Stat. § 334–60(b)(4)(E) (Supp.1977); Neb.Rev.Stat. § 83–325 (1971); Ill.Ann.Stat. ch. 91½, § 2–2 (Smith-Hurd Supp.1977); and Kan.Stat.Ann. § 59–2917 (1975).

**8.** As indicated in the text, D.C.Code 1973, § 16–2305 and § 23–101, respectively, require the Corporation Counsel and the United States Attorney to conduct juvenile and criminal matters. There is no analogous provision requiring a government prosecutorial agency to conduct civil commitment proceedings. In the context of the entire D.C.Code, therefore, it would appear that if a government attorney were necessary to a proceeding, to the exclusion of all private participation, we at least could expect statutory allusion to the government attorney's role.

ess must be satisfied. *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *In re Ballay,* 157 U.S.App.D.C. 59, 66, 482 F.2d 648, 655 (1973).[9] There are similarities between criminal conviction and civil commitment which make the former helpful in determining the due process requirements for the latter. There are, nevertheless—as indicated earlier—significantly different purposes to be served by the two schemes. Fundamentally, of course, the deprivation of liberty under the criminal law is penal, whereas involuntary civil confinement of the mentally ill has a more benign, treatment goal in addition to the objective of protecting the public. Thus, the guarantees of due process cannot be ascertained simply by reference to the criminal law process. Instead, we must ask what is fundamentally fair under the circumstances, taking into account "the interests at stake and the corresponding rights . . . of the respective parties." *In re Ballay, supra* at 64, 482 F.2d at 653.[10] The very flexibility of the constitutional due process concept necessitates this interest-oriented analysis. *See, e. g., Goss v. Lopez,* 419 U.S. 565, 578–79, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *In re Ballay, supra,* 157 U.S.App.D.C. at 64–66, 482 F.2d at 653–55. More specifically, the Supreme Court has instructed that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e. g., Goldberg*

*v. Kelly, supra* [397 U.S. 254], at 263–71, 90 S.Ct. 1011, 25 L.Ed.2d 287. [*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).]

*See also Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 958, 55 L.Ed.2d 124 (1978) (Marshall, J., concurring in part and dissenting in part). We assess appellants' claim against these criteria.

### A. The Private Interests of the Potential Committee

The United States Court of Appeals for the District of Columbia Circuit has identified the prospective committee's "paramount interest" to be liberty—freedom from physical restraint. *In re Ballay, supra,* 157 U.S.App.D.C. at 60, 482 F.2d at 649. Deprivation of this " 'interest of transcending value,' " *In re Ballay, supra* at 67, 482 F.2d at 656 *quoting Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), inflicts a "grievous loss" upon the individual. *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). And indeterminate commitment for mental illness most certainly constitutes a "massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). Secondarily, potential committees are concerned with the related "liberty" interest in avoiding unwarranted attachment of the mental illness label and its enduring social "stigma." *In re Ballay, supra,* 157 U.S.App.D.C. at 79, 482 F.2d at 668. Finally, once the court has made a decision that an individual is committable, he or she has an interest elevated to a constitutional right to treatment. *See Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966).

While the potential committee's individual interests, therefore, are at least threefold, we join the *Ballay* court—and appellants

---

**9.** Our court has adopted the "scholarly reasoning" of Judge Tamm in *Ballay. In re Hodges,* D.C.App., 325 A.2d 605, 607 (1974).

**10.** There is, here, a kinship to the due process inquiry in the juvenile setting, which, despite the striking similarities between criminal and

juvenile cases, focuses on fundamental fairness guided, but not determined, by criminal due process guarantees. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

here—in acknowledging the primacy of the liberty interest.[11]

B. *The Interests of the Government (the Public)*

█ There are two legal foundations for the governmental exercise of authority to confine the mentally ill—the police power and *parens patriae* power.[12] The Ervin Act's focus upon "dangerousness" and rejection of "need for treatment" alone as a basis for commitment, *In re Ballay, supra,* 157 U.S.App.D.C. at 78, 482 F.2d at 661, indicates, from the public's viewpoint, that the "dominant objective of the [District's commitment scheme is] the protection of society," *id.* at 73, 482 F.2d at 667, *i. e.,* the police power rationale. Nonetheless, the inclusion of a "dangerous to self" basis for commitment leads to a conclusion that the public is interested, albeit secondarily, in protection and cure of the mentally ill, *id.* at 61, 69, 482 F.2d at 650, 658—*parens patriae* concerns. Further, the public through its government, has ancillary interests in minimizing "fiscal and administrative burdens," *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. 893; *In re Ballay, supra,* 157 U.S.App.D.C. at 67, 482 F.2d at 656, and, more importantly, in assuring fair trials and dispositions. The "society has an interest in basic fairness which serves to enhance the chance of rehabilitation by avoiding adverse reaction to arbitrariness." *In re Ballay, supra* at 66–67, 482 F.2d at 655–56.

C. *The Risk of Error from the Procedures Used; Probable Value of Additional or Substitute Safeguards*

█ We must now weigh the competing interests, primarily individual liberty versus public protection, to determine, in the words of *Mathews v. Eldridge, supra,* whether "additional or substitute procedural safeguards" are constitutionally required to reduce the "risk of erroneous deprivation" of appellants' interests. In doing so, we must keep in mind, as indicated in our discussion of the Ervin Act, *see* Part I, *supra,* that the primary purpose of the 1964 reforms was to safeguard the constitutional rights of the mentally ill—to assure fair commitment and release procedures and adequate treatment during confinement. *In re Ballay, supra* at 71–73, 482 F.2d at 660–62. More particularly, we must evaluate whether private litigation of civil commitment, absent participation of a public prosecutor, adversely affects a committee's legitimate interests without an offsetting benefit to the public.

Appellants cite the criminal law model, particularly the cases which relate the advantages of a public prosecutor. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Ganger v. Peyton,* 379 F.2d 709 (4th Cir. 1967); *State v. Harrington,* 534 S.W.2d 44 (Mo.1976) (en banc). They argue, by analogy, that the initial advantage from a public advocate is the exercise of impartial discretion in deciding whether to press the case for involuntary hospitalization. The public attorney, we are told, would provide a "screening function" to eliminate frivolous or vindictive petitions, as well as a "plea bargaining function" to achieve compromise dispositions (*e. g.,* voluntary commitment) in the public interest. Appellants maintain that the ethical constraints imposed on the public attorney, *see Berger v. United States, supra,* 295 U.S. at 88, 55 S.Ct. 629, would guard against abuse of the commitment process. Finally, they point out that the prosecuting authorities have access to facili-

---

11. In fact, the interest in freedom from physical restraint limits the treatment alternatives to those which are "least restrictive." *See Covington v. Harris, supra,* 136 U.S.App.D.C. at 41, 419 F.2d at 623; *Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (en banc); *In re Jones,* 338 F.Supp. 428 (D.D.C.1972). *See also Lake v. Cameron,* 118 U.S.App.D.C. 25, 331 F.2d 771 (1964), *cert. denied,* 382 U.S. 863, 86 S.Ct. 126, 15 L.Ed.2d 100 (1965).

12. *See Civil Commitment, supra* at 1208 *et seq.,* 1222 *et seq.* As it relates to the present context, the "police power" is defined as the "inherent power to protect the public" and the "*parens patriae* function [is] viewed as a power which the members of the community have granted the state for the protection of their future well-being." *Id.* at 1222 (footnote omitted), 1208.

ties and resources for determining the best disposition—the least restrictive and most effective treatment for a committee. *See Covington v. Harris, supra; Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (en banc) (earlier case history at note 11, *supra*).

Appellants then cite, in contrast, the perils of permitting a private party to advocate civil commitment. Rather than screen frivolous petitions or propose compromises in the public interest, private parties, it is said, may well be motivated by self-interest (*e. g.,* access to the potential commitee's assets) and possibly by vindictiveness. Further, even if well motivated, private parties are said to lack access to the very information and resources required for the most appropriate disposition.

Appellants maintain, in summary, that the dangers of private party litigation coupled with the advantages of a public prosecutor, lead irresistibly to a constitutional requirement that a petitioner be foreclosed from conducting the commitment hearing.

We conclude that appellants have not made their case. Their analysis may establish the desirability of using a government attorney—a result that is not foreclosed for cases in which the Corporation Counsel elects to go forward, as is the prerogative of that office. *See* D.C.Code 1973, § 1–301; 1 D.C.Code, Appendix, Reorganization Order No. 50, *Office of Corporation Counsel,* Part II, § I (as amended Oct. 23, 1970); *District of Columbia v. Pryor, supra.* However, in stressing the advantages of the public prosecutor's participation, appellants do not come to grips with the constitutional implications of the only point they are advocating: that in the absence of a government attorney, the private petitioner cannot appropriately go forward with the case —"the case must end." To prevail, appellants must demonstrate that the evils of private litigation provide a constitutionally unacceptable risk to their interests, such that the public's interest in having the Commission's commitment recommendation go forward must be abandoned. We turn, therefore, to the alleged evils: (1) failure to provide the "screening" and "compromise" functions inherent in prosecutorial discretion; (2) failure, upon findings of mental illness and dangerousness, to utilize all available resources to provide the least restrictive, appropriate treatment; and (3) self-interest, possibly vindictive motivation.

### 1. *Screening and Compromise*

The screening and compromise functions of the prosecutor are essentially provided for by the present statutory system, even without intervention by a public prosecutor. When a private party files a petition for involuntary hospitalization of another, that petition is first considered by the Commission, "which was established 'in recognition of the fact that the assistance of unbiased experts was essential to assist the courts in dealing with insanity cases.'" *Lake v. Cameron, supra* at 269, 364 F.2d at 662, *quoting from Demarcos v. Overholser,* 78 U.S.App.D.C. 131, 132, 137 F.2d 698, 699, *cert. denied,* 320 U.S. 785, 64 S.Ct. 157, 88 L.Ed. 472 (1943).[13] The Commission then examines "the person alleged to be mentally ill" and "hold[s] a hearing," at which the respondent is entitled to counsel and all relevant evidence is admissible. D.C.Code 1973, §§ 21–542(a), –543; Super.Ct.Ment. H.R. 3. "[I]f the Commission finds . . . that the person . . . is not mentally ill or if mentally ill, is not mentally ill to the extent that he is likely to injure himself or other persons if allowed to remain at liberty, the Commission shall immediately order his release." D.C.Code 1973, § 21–544. If, however, the Commission finds mental illness and dangerousness, it must issue a written report to the Superior Court with findings of fact, conclusions, and recommendations for disposition. *Id.;* Super.Ct. Ment.H.R. 3(b).[14] The court then sets the

---

**13.** D.C.Code 1973, § 21–502, provides for a Commission on Mental Health consisting of "expert" members, eight doctors and one lawyer.

**14.** Rule 3(b) provides:

(b) REPORT BY THE COMMISSION.

(1) TIME FOR FILING. Within five (5) days after a Commission hearing, the Com-

matter for hearing. D.C.Code 1973, § 21–545.

It is apparent that the Commission, as a body of experts, provides the "screening" function normally associated with prosecutorial discretion. Moreover, the fact that the Commission initially dismissed the petition for appellant Rubain's hospitalization, based on his agreement to undergo voluntary treatment, is evidence that that the Commission can and does facilitate "compromise" dispositions.

### 2. The Least Restrictive Disposition

Once the matter comes before the court, the proceeding is "not strictly adversary." *Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661. The trial judge becomes actively involved in developing the facts. He is duty bound, in fact, "to explore alternatives," *Lake v. Cameron, supra* at 267, 364 F.2d at 660, and is therefore empowered to "appoint independent experts," *Rouse v. Cameron, supra,* 125 U.S. App.D.C. at 372, 373 F.2d at 457, and "to seek aid from various sources" in addition to the Commission. *Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661. If the judge is dissatisfied with the Commission's report, he "may require that it be supplemented." *Id.* at 269 n. 18, 364

F.2d at 662 n. 18. Ultimately, a decision to hospitalize the respondent must be based on findings of illness and dangerousness beyond a reasonable doubt, Super.Ct.Ment. H.R. 5(a)—findings by a jury rather than the court if the respondent so elects. D.C. Code 1973, §§ 21–544, –545. The court, however, has the power to grant a directed verdict or a judgment n. o. v. Super.Ct. Ment.H.R. 4 (incorporating Super.Ct.Civ.R. 50). The judge accordingly has broad power to assure a " 'just disposition of [the] case.' " *Rouse v. Cameron,* 125 U.S.App. D.C. at 372 n. 32, 373 F.2d at 457 n. 32 (citation omitted).[15]

Inherent in the responsibilities of the Commission and the court is the obligation to find the most effective, least restrictive disposition. *See Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268, 364 F.2d at 661. Both the Commission and the court are authorized to obtain outside expert assistance in order to assure that the court, at the dispositional stage, utilizes all available knowledge about the alternatives. *Id. See In re Jones,* 338 F.Supp. 428 (D.D.C.1972). Appellants accordingly are unpersuasive in claiming that, without participation by a public prosecutor, the least restrictive, most appropriate disposition cannot be achieved.

mission shall file with the Court all reports required under D.C.Code § 21–544.

(2) CONTENTS OF REPORT. Where the Commission determines that a respondent should be committed, the Commission's report shall contain:

(A) findings of fact;

(B) conclusions;

(C) recommendations for disposition;

(D) the name of any member of the Commission who has dissented from the conclusion.

Findings of fact shall be based on the record and the examination by the Mental Health Commission. Findings shall describe the kind and degree of mental illness found, the nature of the injury threatened, and the likelihood of the occurrence of the threatened injury and shall summarize the evidence upon which these findings are based. The report shall specifically set forth what less restrictive alternatives to hospitalization the Commission has considered, and why these alternatives will or will not be appropriate. The report shall also include a description of the individualized treatment the respondent

has received while in the hospital, and a description of any individualized treatment plan to be implemented in the future. In addition the report shall include recommendations relative to payment of costs of respondent's care.

(3) SERVICE OF REPORT. Copies of the report recommending commitment along with written notice of the right to demand jury trial, shall be served personally on the respondent and his attorney and on any relative who may be required to pay for the cost of respondent's care.

**15.** The trial court's more active role in mental health proceedings than in criminal cases is reflected by the fact that

[i]n many states commitment proceedings are conducted by the judge with the psychiatrist presenting the state's evidence . . . or by a commission of which psychiatrists are members and no attorney represents the state. [*Civil Commitment, supra* at 1285 n. 124.]

### 3. Petitioner Self-Interest and Vindictiveness

We turn, finally, to appellants' concern that private petitioners pose threats of vindictive prosecution for private gain. We agree that a private petitioner has no legitimate personal right to vindicate or legal interest to protect by the civil commitment process. It does not follow, however, that a private party, represented by competent, responsible counsel, is likely to jeopardize important interests in the absence of the restraining influence and authority of a public prosecutor. There is no evidence to support appellants' view that the Commission, and especially the court, are incapable—without assistance by a public prosecutor—of guarding against improper dispositions shaped by the advocacy of self-interested, vindictive petitioners. To the contrary, a petitioner's counsel cannot properly be a dogged, inflexible advocate for one position, without regard to developing evidence. Because of the very nature of the commitment process, petitioner, through his or her counsel, must be an *amicus curiae* of sorts, with a duty to facilitate, not subvert, the aims of the statute. *See* ABA Code of Professional Responsibility, DR 7–102, EC 7–10. If a private party seeks to impede the search for a just result, the trial judge has the duty and power to impose constraints. *See Lake v. Cameron, supra,* 124 U.S.App.D.C. at 268 n. 10, 364 F.2d at 661 n. 10.

### 4. The Record Here; Perspective on Other Cases

We cannot conclude the due process analysis without acknowledging that the Ervin Act of 1964, as well as the pattern of litigation in the District of Columbia and elsewhere throughout the last decade or so, manifests recognition by Congress and the courts that individuals confronted by potential civil commitment require increased procedural safeguards and improved treatment facilities. *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). In addition, we must acknowledge that statutory schemes, arguably ideal on paper, are often implemented in hurried, less-than-thoughtful ways, especially in a complex field such as mental health, where fears and prejudices often prevail over reason and genuine concern, and resources are inadequate to meet needs. We have therefore looked in the record for evidence that would tend to show that our responses to appellants' due process challenge, even if theoretically valid, are factually wide of the mark. We find no such evidence. In fact, there is no evidence of record that appellants' own parents—the petitioners here—could be accused of "railroading" appellants' confinements out of self-interest or personal vindictiveness.[16]

In advocating their proposed rule, appellants are arguing, in effect, for an entire class of potential civil commitees. We therefore have evaluated their arguments in light of the probable impact of the rule on this larger group of persons. One example will suffice. Assume a loving parent who, after providing outpatient psychiatric care over the years for a son who is now age 25 and living at home, is advised by the doctor—after the son attempts suicide—that inpatient care is indicated. Assume, further, that the parent, with the help of the doctor, petitions for civil commitment, and the Commission agrees. Assume, finally, that the Corporation Counsel's office refuses—in appellants' words—to "prosecute," because of either a lack of staff resources or an unexplained aversion to the case. Under appellants' theory, the case could not go forward. It then becomes problematic whether the family can achieve the necessary care. We decline to find a constitutional prohibition against civil commitment of the son, given the protections

16. It is true, in the case of Mr. Kossow, that the Commission *recommended outpatient treatment* whereas petitioner's private counsel advocated inpatient commitment—the recommendation accepted by the court. We have reviewed the record, including the trial judge's colloquy with Mr. Kossow as to why he had absented himself from much of the proceeding. We perceive no self-interest or vindictiveness in the petitioner's conclusion, shared by the court, that inpatient care would be preferable.

afforded by the Commission, judge, and jury. We find no constitutional basis for the government's criminal prosecutor to have, in effect, an absolute veto over civil commitments. We find no violation of due process inherent in permitting a private party to petition and argue for hospitalization and treatment when the government attorney declines to proceed.[17]

### IV. *Conclusion*

We find no statutory or constitutional command forbidding civil commitment of an individual in a judicial proceeding litigated by a private petitioner when the prosecuting authority has elected not to participate. Accordingly, the orders appealed from are affirmed.

*So ordered.*

---

**17.** Appellants also contend that private litigation of civil commitments violates the constitutional separation of powers; they cite the line of cases holding that the executive branch has exclusive discretion to commence, maintain, or dismiss criminal prosecutions. *See Newman v. United States supra; United States v. Cox*, 342 F.2d 167 (5th Cir.), *cert. denied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). Because the civil commitment scheme permits but does not require participation by the Corporation Counsel, we see no infringement upon an exclusive, executive prerogative.

Appellants argue, finally, that equal protection principles will be violated if we permit two categories of civil commitment proceedings— one litigated by private parties, the other by government counsel. As our due process analysis indicates, however, we see no invidious discrimination against potential commitees inherent in a scheme that permits private civil commitment litigation.