**In re Leonid KATZ, Appellee.**

**No. 93–FM–972.**

District of Columbia Court of Appeals.

Argued Jan. 18, 1994.

Decided March 15, 1994.

---

Darrell C. Valdez, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, Lutz Alexander Prager, Asst. Deputy Corp. Counsel, and Janet L. Maher, Deputy Corp. Counsel, were on the brief, for appellant.

Sandra K. Levick, Public Defender Service, with whom James Klein and J. Michael Ryan, Public Defender Service, were on the brief, for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and KERN, Senior Judge.

FARRELL, Associate Judge:

The District of Columbia, on behalf of Saint Elizabeths Hospital, appeals from a pretrial order of the trial judge barring the admission of certain evidence at appellee's impending civil commitment trial. Specifically, Judge Block ordered that "in the trial of this case the government is precluded (i.e., directly and/or collaterally estopped) from presenting all evidence relating to likelihood of harm due to mental illness which antedates July 11, 1991," the date on which a jury had previously refused to order civil commitment of appellee. After Judge Block certified his ruling for interlocutory appeal, D.C.Code § 11–721(d) (1989), this court granted the government leave to appeal and stayed the trial pending resolution of the appeal. We reverse the trial judge's ruling

as we perceive no basis in law for the restriction it would impose on the admission of evidence in the circumstances of this case.

## I.

On September 7, 1990, appellee (Katz) was brought to Saint Elizabeths Hospital for emergency commitment after he was found by a United States Park Police officer standing on Beach Drive swinging a stick at passing cars. While on the hospital ward, Katz became hostile and threatening, stating (according to hospital records) that he would kill all of the females on the ward, and in one case assaulting a female staff member. In a civil commitment trial begun on July 9, 1991, the government introduced evidence of Katz's behavior on Beach Drive and on the hospital ward. A jury determined that Katz indeed suffered from a mental illness, but that he was not likely to injure himself or others as a result of the illness if released. Katz was then discharged from Saint Elizabeths at his request.

At the time of that trial, the government possessed additional evidence of abnormal behavior by Katz which, for reasons the parties dispute, it did not present to the jury. In particular, in December 1988, Katz had been hospitalized at Saint Elizabeths after he allegedly assaulted a female news reporter who was entering the gates at the White House. The application for emergency hospitalization stated that Katz appeared at the White House gates demanding to talk to the President about a female conspiracy against him. A month after his release from the hospital in April 1989, Katz was arrested after allegedly assaulting Sharon Rogers, a female employee of the FBI, while he was visiting the FBI building. After treatment at Saint Elizabeths to insure his competency to stand trial, Katz pleaded guilty on May 24, 1990, to simple assault against Rogers.

The present petition for civil commitment originated on July 30, 1991, when Katz was hospitalized at Saint Elizabeths after he had returned to the FBI building reportedly to "talk about his life."[1] The Hospital filed a

---

1. Meanwhile, appellee had voluntarily returned to Saint Elizabeths on July 19, 1991, after he

petition for judicial hospitalization on August 2, 1991. At a probable cause hearing on August 6, Katz testified that women were conspiring to place him in Saint Elizabeths for experimental purposes and to "drive [him] crazy."[2] At a hearing before the Mental Health Commission on September 5, 1991, Katz further testified that women had conspired to ship him to an underground hell in order to convert his body into a woman's. Dr. Raymond Brown, one of Katz's treating psychiatrists, testified that Katz was suffering from schizophrenia, paranoid type. As a result of this mental illness, and based in part on Katz's pre–1991 assaults upon women in the community, Dr. Brown testified that Katz was likely to injure himself and others if not hospitalized.

The government has also proffered records showing that during his present admission to Saint Elizabeths Hospital, Katz's behavior on the ward has mirrored his conduct in the community—he has been aggressive, threatening, and assaultive. The District summarizes this evidence as follows: "Although Mr. Katz has made some improvement in his mental condition with the help of medication and psychosocial therapies, he continues to insist that he is not mentally ill; has evidenced continued hostility toward female staff; and has assaulted female patients without provocation."[3]

After the Mental Health Commission recommended Katz's indeterminate hospitalization, he exercised his statutory right to a jury trial. D.C.Code § 21–545 (1989). Trial initially began on February 11, 1992, with Katz representing himself but with legal counsel in the courtroom to assist him. Katz moved to exclude all evidence of his conduct evincing a likelihood of injury to himself or others that predated the July 11, 1991, civil commitment trial. Judge Dorsey denied this

motion, and Katz then waived his right to a trial by the court or a jury. Upon review of the record, Judge Dorsey found by clear and convincing evidence that Katz was mentally ill and likely to injure himself or others unless committed to the hospital.

On September 17, 1992, however, Judge Dorsey granted Katz's motion to vacate both the acceptance of his waiver of trial and the order of commitment, and ordered a jury trial. Now represented by counsel, Katz again moved for a ruling "that the government is precluded (*i.e.*, directly and/or collaterally estopped) from presenting all evidence relating to dangerousness which antedates July 11, 1991 (the date of the jury verdict in the [first civil commitment]) trial...." Judge Block, to whom the case had been reassigned, granted the motion in a one-sentence written order on June 21, 1993. From his oral discussion of the motion, it is clear that the judge intended to bar both the direct introduction of the pre–1991 evidence and reliance by the government's psychiatric experts on that evidence as the whole or partial basis for their opinions. The judge thus effectively barred the Hospital from adducing at trial the following evidence (as set forth in the Hospital's brief) of "a pattern of dangerous behavior [by Katz] toward women":

[If permitted,] Secret Service Officer John Casucci will testify regarding the attack on the female reporter on December 8, 1988, and both Larry Potts and Sharon Rogers will testify regarding the attack on Ms. Rogers in front of the FBI building on May 15, 1989. Appellant also expects that its expert psychiatric witnesses, Lynn Deutsch, M.D., and Erlinda Marquez, M.D., will testify that Mr. Katz is presently mentally ill and likely to injure himself

---

began feeling depressed and suicidal and had cut his wrists. He signed out of the hospital against advice on July 24, 1991.

2. Appellee described his return visit to the FBI building as follows:

   [So] then I walked in and I see three ladies.... I said it very loudly, "These women are going to put their hands on me. All the women are trying to put their hands on me." ... From behind me were coming the police officers with walkie talkies and guns and all surround-

ed me. So the next thing I did I just lay on the floor....

3. For example, the District points to an incident during the present hospitalization where Katz allegedly had to be prevented forcibly from choking a female patient on the ward, and when later asked why he had done the act, stated that he "was forced to do it" when she stepped on his feet.

or others as a result thereof. Dr. Deutsch and Dr. Marquez will testify that Mr. Katz has exhibited a pattern of behavior in which he acts upon his delusional beliefs that women are conspiring against him and he becomes threatening and assaultive toward women who happen to be nearby. This testimony will be based, in part, upon the hospital record and fact witness testimony regarding the pre–1991 behavior in the community.

Acknowledging the obvious importance of this evidence to the government's case, the judge certified the issue of admissibility for interlocutory appeal.

## II.

■ "A civil commitment proceeding focuses on the respondent's mental condition at the time of the hearing." *In re Samuels,* 507 A.2d 150, 152 (D.C.1986). For this reason, "[a]n earlier jury's determination of an individual's mental state at some past time is not proof of his or her current condition." *Id.* Indeed, a past determination of the condition has so little relevance that the government may not appeal an adverse judgment in a civil commitment proceeding, *In re Lomax,* 386 A.2d 1185, 1188–89 (D.C.1978) (en banc); an appeal could "lead to no meaningful determination as to the fact in issue," which is "the *current* mental condition of the patient." *Id.* at 1189 (emphasis in original). Instead, the government's recourse for a verdict of no-commitment allegedly tainted by error is to initiate a new proceeding: "[b]y the simple expediency of filing a [new petition for judi-cial hospitalization], the whole process may begin anew within the confines and protections of the [D.C. Hospitalization of the Mentally Ill] Act...." *Id.*[4]

Despite this focus in civil commitment upon the patient's current mental condition, the trial judge in this case gave preclusive effect to a jury's past refusal to order commitment by restricting the evidence the government may present at Katz's impending trial. He ruled that, as the previous jury found Katz to be mentally ill but not likely to injure himself or others if released, so the present jury may not consider directly or through the opinion of physicians any evidence the Hospital either adduced or could have adduced at the first trial on the issue of dangerousness. We conclude that neither ground on which Katz seeks to defend this ruling can be sustained.[5]

■ First, Katz argues that traditional estoppel or preclusion principles can be "tailored" to deny the government "a second chance" to introduce evidence which it had in its possession at the time of the first trial.[6] We view skeptically the application of estoppel and preclusion principles to this context. In a criminal case, collateral estoppel is embraced within the Fifth Amendment's guarantee against double jeopardy. *See Ashe v. Swenson,* 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970). But, as Katz concedes, the double jeopardy bar does not apply to civil commitment. *See, e.g., Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957) ("underlying

4. Recently, in *In re Barlow,* 634 A.2d 1246, 1248–49 (D.C.1993), we noted a "narrow" exception to the *Lomax* holding of non-appealability not applicable here. We did describe as "eminently sound," however, *Lomax*'s functional equation of an appeal right and the commencement of a new civil commitment proceeding:

Where the validity of the verdict itself is attacked by the petitioner, it is within petitioner's power to effectuate the desired remedy merely by instituting a new petition. Whether pursued via appeal or the filing of a new petition, the hospital achieves the same goal, a new trial on the merits. At 1249 n. 5.

5. In view of our disposition of this appeal, we need not consider the District's argument that the "law of the case" doctrine prevented Judge Block from reconsidering and nullifying Judge

Dorsey's earlier ruling in a proceeding where Katz appeared *pro se. See, e.g., In re Barlow, supra* note 4, at 1248 n. 3.

6. The Hospital attempts to demonstrate that its failure to use the pre–1991 evidence in the first trial was justifiable—that it was "irrelevant" to the theory on which the Hospital then sought Katz's commitment. Katz disputes this narrow explication of what was relevant at the first trial as an afterthought by government counsel, but we need not concern ourselves with this dispute. We assume for the sake of argument that carelessness, nothing more, caused the government not to present the disputed evidence at that trial. Moreover, we assume that the legal analysis would be identical if the government had actually introduced the evidence in the trial that resulted in a verdict of no-commitment.

idea" of double jeopardy protection is that the State "should not be allowed to make repeated attempts to *convict* an individual for an alleged offense") (emphasis added); *Jones v. United States*, 463 U.S. 354, 369, 103 S.Ct. 3043, 3052, 77 L.Ed.2d 694 (1983) (as civil committee "was not *convicted*, he may not be punished") (emphasis added). Absent that prohibition, we are quite reluctant to apply preclusion principles in a context where more is involved than simply a dispute between private litigants. *Cf. Standefer v. United States*, 447 U.S. 10, 24, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980) (declining to apply nonmutual collateral estoppel against government in criminal case, unlike in "disputes over private rights between private litigants" where "no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue"). As the Supreme Court has pointed out, important and "legitimate interests of both the state and the patient ... are served by civil commitments." *Addington v. Texas*, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979).[7] Reflecting the strong public interest in the just outcome of civil commitment proceedings, this court has stressed that the determination of a patient's present mental condition should be made upon the broadest possible evidentiary basis. *E.g., In re Melton*, 597 A.2d 892, 900–06 (D.C.1991) (en banc); *In re Samuels*, 507 A.2d at 152. To exclude evidence concededly probative of Katz's current mental illness and danger to himself or others because of a past default by the government in using it, would put the interests implicated by civil commitment seriously at risk.

■ Collateral estoppel, of course, has no immediate application to this case. For that bar to operate, the issue sought to be litigated must "actually and necessarily [have been]

determined" previously by a court. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). As already explained, the issue before the trial court is Katz's current mental condition, not his condition in 1991. Further, since no evidence of the pre–1991 conduct which the Hospital now seeks to prove "was offered at the first hearing, these acts were not in any sense the subject of actual litigation at the first hearing," *In re Alfred P.*, 126 N.H. 628, 495 A.2d 1264, 1265 (1985), so that "[c]ollateral estoppel is ... not operable." *Id.*

■ *Res judicata*, though somewhat closer to the mark, also fails to justify the trial judge's ruling. It "prevent[s] the same parties from relitigation of not only those matters actually litigated but also those which *might have been* litigated in the first proceeding." *Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367, 369–70 (D.C.1988) (emphasis added) (citations and internal quotation marks omitted). We have assumed, note 6, *supra*, that nothing prevented the government from litigating Katz's pre–1991 actions in the first trial. But to be barred by *res judicata*, a second suit must be based on the same cause of action as the first. *Smith v. Jenkins*, 562 A.2d 610, 613 (D.C.1989). Here again, the issue—the "cause"—which the government presently intends to litigate is not the issue the 1991 jury decided, so much so that, as *Lomax* held, the government's remedy for alleged error in the first trial would have been to institute a new civil commitment proceeding, not to appeal. It is illogical to deny the Hospital the ability to appeal an adverse civil commitment judgment *because* it may initiate a new proceeding focusing on the patient's present mental condition, yet at the same time to give that judgment—erroneous though it may be—preclusive effect by restricting the evidence admissible at the second trial.[8]

---

**7.** As this court explained in *In re Nelson*, 408 A.2d 1233, 1237 (D.C.1979) (footnote omitted):

   [I]n civil commitment cases the state reflects a parens patriae concern for the treatment of the seriously disturbed citizen. Hospitalization of the mentally ill is sought not as an end in itself, but only as a necessary means for giving medical treatment and protection. As a result, the commitment process cannot be viewed as a

strictly adversarial one; in most cases, the ultimate interests of the state and the individual in the care and treatment of the latter should be congruent.

**8.** We reject Katz's suggestion that, although the government could not appeal the original verdict, this court now can review the record of the first trial and satisfy itself that "there is not ... a hint of error" in that proceeding. That proce-

Katz urges us not to elevate form over substance by applying the "same-cause" requirement of *res judicata* too literally. He argues that reliance on the "truism" that civil commitment focuses on the patient's present mental state—making past adjudications irrelevant—would leave the Hospital free to seek

> an immediate rehospitalization of a patient motivated by nothing more than a belief that the jury returned the wrong verdict. At the new trial, where the patient's current likelihood of danger is to be decided, the government could rely on nothing more than the evidence which it had at the time of the prior verdict.

This, however, describes a very different case from the present one, in which the government has proffered substantially more evidence than "it had at the time of the prior verdict." We therefore need not consider how preclusion concepts would apply to a hypothetical case where only dissatisfaction with the first verdict prompted the government to seek civil commitment a second time. Katz urges, alternatively, that we adopt a standard of proof which *new* evidence of mental illness or dangerousness must surmount before it may be combined with evidence the government previously presented to (unsuccessfully) or withheld from a jury. We decline to do so, because to decide this case we need only observe that the government's decision to petition a second time for judicial hospitalization is supported by the proffer of substantial evidence of behavior by Katz since the first verdict suggesting he is likely to injure himself or others if at liberty.

See pages 685–86 & nn. 1 & 2, *supra.* In such a case, the aims of civil commitment would be thwarted were we to require the Hospital to attempt to prove a pattern of dangerous behavior by Katz using only a truncated portion of the relevant evidence.[9]

Katz's second argument is that, preclusion concepts aside, constitutional due process requires the "reasonable accommodation of the competing interests of Mr. Katz and the government" which Judge Block adopted—permitting a new civil commitment trial despite the previous verdict, but restricting the evidence on which the government may rely.[10] We disagree on the facts before us; the flexibility inherent in due process, *In re Kossow,* 393 A.2d 97, 104 (D.C.1978), is inconsistent with this evidentiary straitjacket. The procedures an individual is afforded before civil commitment may be ordered under the District's statute are comprehensive; we have reviewed them before and need not do so here. *E.g., In re Herman,* 619 A.2d 958, 963–66 (D.C.1993) (en banc); *In re Kossow,* 393 A.2d at 101–03. Katz does not challenge their constitutionality as such, nor could he successfully. *E.g., id.* at 103–09; *In re Nelson, supra* note 7, 408 A.2d at 1237. He argues only that the statute must be read constitutionally so as to prevent successive efforts to commit a person using essentially the same evidence of antisocial conduct. We might view this argument more favorably were the government indeed seeking to commit Katz a second time with evidence replicating that it could have presented at the first trial.[11] But from every-

---

dure would require, in effect, the very appeal *Lomax* forbids, and at a point in time potentially long after the first trial ended.

9. Katz suggests that, at a minimum, only his behavior post-dating the original verdict *and* committed before the government filed its latest petition for judicial hospitalization should be considered in deciding the preclusive effect of the first verdict—with the result that his recent behavior on the hospital ward would not be counted. No sound reason supports this exclusion of what may be some of the most probative—because most recent—evidence of Katz's mental condition and potential dangerousness "at the time of the [civil commitment] hearing." *In re Samuels,* 507 A.2d at 152.

10. Katz points out that given the precise verdict in the first trial, Judge Block placed no limits on the evidence the government may adduce of his mental illness, as distinct from dangerousness, and even on the issue of dangerousness excluded only evidence of behavior pre-dating the 1991 trial.

11. *Cf. Gomes v. Gaughan,* 471 F.2d 794, 797 (1st Cir.1973) ("[T]he oppressive misuse of multiple commitment [as a Sexually Dangerous Person under Massachusetts law] proceedings would doubtless be a violation of due process. For example, had the petitioner been found not sexually dangerous in the 1962 proceeding, a question might arise whether another ... hearing *in the absence of intervening misbehavior* was so

thing apparent in this record, Katz's recent and continuing behavior has provided clear reason for the Hospital to initiate new civil commitment proceedings. Furthermore, the statute provides effective means by which both the trial court, D.C.Code § 21–523 (1989), and the Mental Health Commission, *id.*, §§ 21–542, –544, can identify and dismiss petitions grounded on outdated and insubstantial evidence of current mental illness and dangerousness. On this record, due process does not require us to engraft on these procedures the additional rule of exclusion Katz urges, which would deny to the factfinder relevant evidence of his potential danger to himself or others.

Reversed.

unfair as to violate due process" (emphasis add-  ed; original emphasis omitted)).