**In the Matter of Aaron NELSON, Appellant.**

No. 13768.

District of Columbia Court of Appeals.

Argued Sept. 21, 1979.

Decided Dec. 4, 1979.

Thomas C. Devlin, Washington, D. C., appointed by the court, for appellant.

Robert St. John Roper, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., when the brief was filed, and John A. Terry, Richard W. Goldman, and Michele A. Goldfarb, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEBEKER, HARRIS and PRYOR, Associate Judges.

HARRIS, Associate Judge:

Appellant was civilly committed to Saint Elizabeths Hospital after a non-jury trial. He now argues that there was insufficient evidence upon which the trial court could have based its finding that he was likely to endanger himself and/or others. *See* D.C. Code 1973, § 21–545(b). Finding sufficient evidence to support the trial court's findings, we affirm.

 Another issue has surfaced in this appeal, namely, the effect of the Supreme Court's opinion in *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)—decided after appellant's initial brief was filed—on the proper standard of proof for civil commitment proceedings in this jurisdiction.[1] We conclude that since appellant was civilly committed using the highest standard of proof, *i. e.,* beyond a reasonable doubt, which was in effect at the time of appellant's trial, *Addington* has no direct effect on appellant's case.[2] However, inescapably *Addington* has a controlling ef-

1. *Addington, supra,* holds that a "clear and convincing" standard of proof is required from a due process standpoint in a civil proceeding brought under state law to commit an individual involuntarily to a mental hospital. The Texas Supreme Court had held that a "preponderance of the evidence" standard of proof in such a proceeding satisfies due process requirements. The Supreme Court disagreed, concluding that to meet due process demands in commitment proceedings, the standard of proof has to inform the factfinder that the proof must be greater than the preponderance of the evidence standard that is applicable to other categories of civil cases. However, as discussed *infra,* the Court rejected a "beyond a reasonable doubt" standard. *Addington, supra,* 99 S.Ct. at 1812–13.

2. There are three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between parties. A plaintiff's burden of proof there is a mere preponderance of the evidence; the litigants share the risk of error in roughly equal fashion.

The *Addington* Court explained the opposite end of the spectrum as follows:

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship,* 397 U.S. 358 [, 90 S.Ct. 1068, 25 L.Ed.2d 368] (1970). [*Addington, supra,* 99 S.Ct. at 1808 (footnote omitted). *See generally* Underwood, *The Thumb on the Scales of Justice : Burdens of Persuasion in Criminal CAses,* 86 Yale L.J. 1299 (1977).]

The Court in *Addington* discussed and endorsed a middle standard which had not been urged by the parties:

The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." * * One typical use of the standard is in civil cases involving allegations of fraud or some

fect on civil commitment proceedings tried subsequent to its issuance.

## I

Appellant appeared at the White House on December 13, 1977, and again on March 2, 1978. On both occasions he stated he was Nelson Rockefeller, asserted that he was the President of the United States, and requested admittance as the rightful occupant of 1600 Pennsylvania Avenue.

At the time of appellant's December 13 visit to the White House, he had been in Washington for only one hour and had only some change in his pocket. He was removed from the White House grounds by members of the Metropolitan Police force. Thereafter he was taken to Saint Elizabeths Hospital pursuant to an application for emergency hospitalization which was filed under D.C.Code 1973, § 21–521.

Dr. Eliseo Verde, a staff psychiatrist at Saint Elizabeths, conferred with appellant soon after he was admitted. Appellant "introduced himself as Nelson Rockefeller, the President of the United States." He told Dr. Verde that he had been President of the United States since 1976, that his father was John D. Rockefeller, III, and that he owned several buildings in New York City. Appellant further explained that in 1976 "he was admitted to a general hospital where he was operated on and his brain was removed and something else was put in place of it." Dr. Verde diagnosed appellant's mental condition as schizophrenia, paranoid type, which he said is chronic rather than episodic in that appellant suffers from a "fixed delusion" that he is both Nelson Rockefeller and the President of the United States.

The Superintendent of Saint Elizabeths petitioned for appellant's civil commitment on December 21, 1977. See D.C.Code 1973, § 21–541. Appellant was ordered detained at Saint Elizabeths indefinitely upon the recommendation of the Commission on Mental Health.[3]

On February 24, 1978, appellant broke the nose of a nurse on his ward at Saint Elizabeths. Appellant struck the nurse during a scuffle among patients. Following that incident, appellant was given an injection of Thorazine; thereafter, appellant accepted his medication voluntarily most of the time.

A hearing in Superior Court on the Commission's recommendation was set for March 3, 1978, but meanwhile appellant's cousin had volunteered to help him obtain psychiatric treatment in Alabama. Appellant was waiting at the airport (under supervision) for his flight to Alabama, but he slipped away when he was left unattended for a few moments. He went again to the White House, and again demanded entry as the President of the United States. He then was hospitalized pursuant to another petition for emergency hospitalization.

On March 31, appellant left the hospital grounds and went to the Treasury Department building to converse with Secret Service agents. He returned to the hospital voluntarily.

On June 13, 1978, appellant waived his right to a jury trial and offered no evidence on his own behalf. At the conclusion of the commitment hearing, the trial court found:

> [T]hat the respondent, Mr. Aaron Nelson, is mentally ill and bases that finding upon the really uncontested testimony of both Dr. Verde and Dr. Singleton.

---

other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important in-

dividual interests in various civil cases. [99 S.Ct. at 1808 (citations omitted).]

**3.** Appellant refused to attend hearings before the Mental Health Commission because he did not "recognize" the Commission. He also refused to accompany hospital staff members to his civil commitment trial, necessitating his transport to court by Deputy United States Marshals. Appellant also refused to take his prescribed medication (Thorazine).

Second, the Court finds that because of that mental illness of the particular delusions from which Mr. Nelson does suffer, that beyond a reasonable doubt, it is clear to the Court that Mr. Nelson would be a *danger to himself* and would be likely to place himself because of the delusions he holds, in a position of danger and in a position where he would be likely to suffer harm. There is no doubt based on the testimony that's been presented to the Court, two separate instances of showing up at the White House, that because of the delusions that Mr. Nelson suffers from that he would return to the White House at some point he would place himself in danger at the White House.

## II

■ We conclude that the decision of the trial court should not be disturbed. There is factual support for the commitment finding in the record, and that finding is not based on an erroneous legal premise. *See Rouse v. Cameron,* 125 U.S.App.D.C. 366, 374, 373 F.2d 451, 459 (1967). The substantive test for civil commitment, *i. e.,* "the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty . . .," D.C.Code 1973, § 21–545(b), has been met. In assessing appellant's potential danger, the trial court properly could look to the nature of the mental illness as well as the history of his conduct. *See Overholser v. O'Beirne,* 112 U.S.App.D.C. 267, 276, 302 F.2d 852, 861 (1961).

The factors upon which the trial court correctly based its judgment include the following: (1) appellant is a paranoid schizophrenic; (2) he has a fixed delusion that he is Nelson Rockefeller, whom he believes to be the President of the United States; (3) without medication, appellant consistently has acted in accordance with that

delusion; (4) appellant once struck a nurse by whom he felt threatened; (5) appellant's illness would be likely to compel him to lose control in an insecure environment; and (6) appellant is likely either to injure himself or place himself in a situation in which harm would come to him.

## III

■ The government argues that the Supreme Court's recent decision in *Addington v. Texas, supra,* effected a change in the burden of proof standard for civil commitment proceedings in this jurisdiction.[4] We do not discuss at length the historical, philosophical, or symbolic bases of the various burdens of proof. Instead, we recognize with but a brief discussion that under *Addington* a "clear and convincing" standard now is the constitutionally appropriate one here.

Our previous decision which modified the burden of proof standard from a preponderance of the evidence to proof beyond a reasonable doubt was *In re Hodges,* D.C. App., 325 A.2d 605 (1974). It was bottomed on our then-interpretation of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[5] Our *Hodges* decision dispositively analogized the civil commitment process to a juvenile delinquency proceeding. We now recognize that the loss of liberty and the social stigma associated with a finding of guilt in a delinquency proceeding are significantly different from the consequences of a commitment proceeding. The Supreme Court noted in *Addington* that the civil nature of a commitment proceeding calls for a different burden of proof than exists in a criminal case:

> The heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free. *Patterson v. New*

4. At oral argument, counsel for appellant acknowledged that *Addington* prospectively changed the burden of proof to "clear and convincing" in civil commitment cases in the District of Columbia.

5. We also relied heavily upon the circuit court's opinion in *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648 (1973). Thus, in *Hodges* we stated:

> We find Judge Tamm's scholarly reasoning in *Ballay* persuasive and, accordingly, adopt the holding of that decision. [325 A.2d at 607.]

York, 432 U.S. 197, 208 [, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281] (1977). The full force of that idea does not apply to a civil commitment. It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction, 5 Wigmore § 1400. However, even though an erroneous confinement should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected. [*Addington, supra,* 99 S.Ct. at 1810–11.]

▮ Unquestionably an involuntary civil commitment to a mental hospital constitutes a significant deprivation of liberty that requires due process protections. *See, e. g., Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *In re Kossow,* D.C.App., 393 A.2d 97 (1978); *In re Ballay,* 157 U.S.App.D.C. 59, 66, 482 F.2d 648, 655 (1973); *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (BURGER, C. J., concurring). *See generally* Note, *Procedural Safeguards for the Involuntary Commitment of the Mentally Ill in the District of Columbia,* 28 Cath.U.L.Rev. 855 (1979). A determination under the Constitution of "what process is due" in a particular situation involves a careful assessment of the likely impact of a specific procedure on the competing interests to be affected thereby. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process always involves a comparative balance. *See Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

In criminal and juvenile delinquency cases, the Supreme Court has concluded that the interests of the individual so outweigh the state's interest that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship, supra,* 397 U.S. at 364, 90 S.Ct. at 1073. Conversely, in civil commitment cases the state reflects a parens patriae concern for the treatment of the seriously disturbed citizen.[6] Hospitalization of the mentally ill is sought not as an end in itself, but only as a necessary means for giving medical treatment and protection. As a result, the commitment process cannot be viewed as a strictly adversarial one; in most cases, the ultimate interests of the state and the individual in the care and treatment of the latter should be congruent.

The Supreme Court aptly noted that: "One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma." *Addington, supra,* 99 S.Ct. at 1811. The purpose of a commitment is the providing of psychiatric treatment, and the hope is that the individual's condition can be cured or alleviated through such medical intervention. It is true that the commitment procedure in some cases reflects an exercise of the state's police power to protect itself against what it perceives to be the dangerous mentally ill, but even in such cases the ancillary concern of providing treatment to such persons is part of the mandated scheme. *See* D.C.Code 1973, § 21–562; *Rouse v. Cameron, supra.*

We both are bound by and concur in the Supreme Court's unanimous rejection in *Addington,* of the beyond a reasonable doubt standard.[7] The Court stated:

6. In rejecting the "beyond a reasonable doubt" standard for civil commitment proceedings in *Addington,* the Court noted that the criminal law standard could free a jury (or a trial judge) "to reject commitment for many patients desperately in need of institutionalized psychiatric care. * * * Such freedom for a mentally ill person would be purchased at a high price." 99 S.Ct. at 1811 (citation omitted).

7. Unlike the states, we operate exclusively under the Constitution of the United States. Additionally, the opinion in *Addington* demonstrates that the interpretation of *In re Winship* which led to our *Hodges* decision was incorrect.

We have concluded that the reasonable doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment. [99 S.Ct. at 1812–13.]

Since a civil commitment proceeding focuses on the individual's psychiatric condition as well as on his past behavior, both the diagnosis and the prognosis are predicated in major part upon the testimony of expert witnesses. It is extremely difficult to prove the existence of the requisite factors beyond a reasonable doubt. As expressed by one noted judge prior to the decision in *Addington* : "Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases." *Tippett v. Maryland,* 436 F.2d 1153, 1165 (4th Cir. 1971) (Sobeloff, J., concurring and dissenting), *cert. dismissed sub nom. Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972). A clear and convincing burden of proof accommodates the uncertainty inherent in the medical aspects of a civil commitment proceeding.[8]

Although we here recognize the modified procedural aspects of a compulsory hospitalization, the goal of any commitment is to restore the individual's mental health so that the individual may return acceptably to society. By the same token, it must be borne in mind that the Supreme Court has precluded the states from committing mentally ill persons who are dangerous to no one and who can live safely in freedom. *See O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Our own statutory scheme establishes a right to clinically appropriate placement and treatment in the least restrictive alternative. D.C.Code 1973, §§ 21–545(b) and –562; *see Covington v. Harris,* 136 U.S.App. D.C. 35, 41–43, 419 F.2d 617, 623–25 (1969); *Dixon v. Weinberger,* 405 F.Supp. 974 (D.D. C.1975). It also provides for a review of each committed person's condition at periodic intervals. D.C.Code 1973, § 21–548;[9] *see United States v. Ecker,* 177 U.S.App. D.C. 31, 47, 543 F.2d 178, 194 (1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *Bolton v. Harris,* 130 U.S.App.D.C. 1, 11, 395 F.2d 642, 652 (1968).

The Supreme Court stated in *Addington* :

Having concluded that the preponderance standard falls short of meeting the demands of due process and that the reasonable doubt standard is not required, we turn to a middle level of burden of proof that strikes a fair balance between the rights of the individual and the legitimate concerns of the state. [99 S.Ct. at 1812.]

Consistent therewith, the clear and convincing burden of proof is now binding on trial courts in this jurisdiction in civil commitment proceedings.[10] This "middle level of burden of proof" which we recognize herein is of no avail to appellant, however, since he was committed without error under the then-applicable higher standard of proof.

*Affirmed.*

NEBEKER, Associate Judge, concurring:

I concur in the court's opinion in this case. In addition, it is evident that the

---

8. There is no guidance as to the appropriate burden of proof in either the commitment statutes or their legislative history, as evidenced by the fact that prior to *In re Hodges, supra,* the accepted standard was a preponderance of the evidence. *See In re Hodges, supra,* 325 A.2d at 607.

9. That Code provision states:
 § 21–548. Periodic examinations by hospital authorities; release
 The chief of service of a public or private hospital shall, *as often as practicable, but not* less often than every six months, examine or cause to be examined each patient admitted to a hospital pursuant to this subchapter and if he determines on the basis of the examination that the conditions which justified the involuntary hospitalization of the patient no longer exist, the chief of service shall immediately release the patient.

10. The resolution of this question renders inapposite the "beyond a reasonable doubt" language which had become part of Superior Court Mental Health Rule 5(a) as a consequence of our prior opinion in *In re Hodges, supra.*

Supreme Court's rationale in *Addington v. Texas,* —— U.S. ——, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), concerning the material differences between civil commitment proceedings and juvenile delinquency or criminal proceedings should prompt a reexamination of this court's en banc decision in *In re Lomax,* D.C.App., 386 A.2d 1185 (1978) (vacating a panel decision reported at 367 A.2d 1272 (1976)). The central issue of *Lomax* was whether the government could appeal an adverse decision in a civil commitment proceeding. The en banc majority opinion held that the government had no such right. As the dissent observed, the *Lomax* majority decision is devoid of a rationale. *Id.* at 1189. However, there are general references in the en banc opinion to the constitutional rights of the individual within the civil commitment process and a likening of that process to a criminal proceeding. Specifically, the majority stated that the commitment "legislation operates to defeat this appeal just as certainly as the double jeopardy clause does in the criminal law context." *Id.* at 1188. That statement is footnoted with a reference to the patient's argument "that the double jeopardy clause applies to civil commitment proceedings just as it does to juvenile delinquency proceedings." *Id.* at 1188 n.10. The *Lomax* opinion is replete with references analogizing the civil commitment process to a criminal proceeding and infers that the same constitutional rules should apply to both.[1]

It is undisputed that an individual's liberty interest is at stake in an involuntary commitment proceeding and consequently procedural due process protections apply. *Addington v. Texas, supra,* 99 S.Ct. at 1809 (and citations following). However, the application of procedural due process does not result in the full panoply of rights accorded in a criminal proceeding. *See In re Ballay,* 157 U.S.App.D.C. 59, 60, 482 F.2d 648, 649 (1973). More than the individual's liberty interest is at stake in a civil commitment.

The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorder to care for themselves; the state also has the authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill. [*Addington v. Texas, supra,* 99 S.Ct. at 1809.]

It is a balancing of these interests that will establish the procedures that are constitutionally mandated in the civil commitment process. *See Developments—Civil Commitment,* 87 Harv.L.Rev. 1189, 1272 (1974). In *Addington,* the Court rejected the "beyond a reasonable doubt" standard for civil commitment proceedings and noted that the risk of error in a criminal conviction "must be minimized even at the risk that some who are guilty might go free." *Addington v. Texas, supra,* 99 S.Ct. at 1810. However, the Court reasoned that although an erroneous "civil commitment is sometimes as undesirable as an erroneous conviction," there are subsequent circumstances in a civil commitment proceeding which mitigate against a person's continued confinement when he is no longer ill and poses no danger. These factors include the "layers of professional review and observation of the patient's condition, and the concern of family and friends." *Id.* 99 S.Ct. at 1811.[2]

Criminal convictions are viewed as stigmatizing an individual. Such stigma, as well as the loss of one's liberty, has supported the Court's rationale that due process requires the standard of proof used in criminal cases.[3] The Court in *Addington*

---

1. *See* for example the majority statement at 1189 regarding the allowance of a government appeal to vindicate a public interest in halting the serious misconduct of a trial counsel where it is reasoned that "this is a problem which has been handled in the criminal law for centuries without allowing the government to appeal from an acquittal."

2. The District of Columbia statute requires periodic examination by hospital authorities no less than every six months to determine if the hospitalized individual should be released. D.C.Code 1973, § 21–548.

3. *See* Justice Harlan's analysis in *In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), of the considerations involved in setting the burden of proof standard in juvenile delinquency proceedings at beyond a reasonable doubt.

reasons that the stigma attaches to a mentally ill person with his illness and not solely with the incident of his commitment. *Addington v. Texas, supra,* 99 S.Ct. at 1809. Thus, the individual's interest in avoiding an erroneous determination in a civil commitment proceeding is not as significant as those of a defendant in a criminal proceeding. The balancing of the individual's interest against those of the state, both in its parens patriae capacity and in the exercise of its police power, produces a different outcome for civil commitment proceedings from that of criminal proceedings. I suggest that since our statute requires proof of dangerousness to oneself or to others before commitment, the societal interest of preventing such injury outweighs the risk of an erroneous prolonged hospitalization during the time of a government appeal from an adverse trial ruling in a civil commitment proceeding. Such an appeal would not be undertaken for frivolous or technical reasons, but rather to correct manifest errors likely to result in dangerous individuals not getting needed treatment.

In light of the *Addington* decision and rationale, I suggest that our decision in *Lomax,* based as it is on glib and undefined statements of constitutional rights of the mentally ill and the likening of a civil commitment to a criminal conviction, no longer is valid. I submit that specific statutory authority for government appeals in mental commitment cases is not now barred, even if *Lomax* were earlier to have been read as erecting such a prohibition.