Alma STREICHER, et al., Plaintiffs,

v.

William PRESCOTT, M.D., et al., Defendants.

James Angus McDONALD, et al., Plaintiffs,

v.

William PRESCOTT, M.D., et al., Defendants.

Civ. A. Nos. 83–3295, 84–1538.

United States District Court, District of Columbia.

May 19, 1987.

Arlene S. Kanter, Mental Health Law Project, Washington, D.C., for plaintiffs.

John Facciola, Asst. U.S. Atty., Office of Legal Advisor, Pastell Vance, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

These consolidated proceedings present serious questions involving patients confined since before 1973 to St. Elizabeths Hospital, a public mental health facility, located in the District of Columbia.[1] These

---

1. St. Elizabeths Hospital was established in 1855 as a "Government Hospital for the Insane" controlled and administered by the federal government. Cong.Rec. S13826 (daily ed. Oct. 5, 1984). As early as 1969, the federal government questioned the appropriateness of its role as the major mental health provider for residents of the District of Columbia. After much belaboring and numerous proposals for transferring jurisdiction to the local government, Congress enacted in 1984 the Mental Health Services for District of Columbia, 24 U.S.C. § 225 (1984).

patients were all involuntarily committed in civil proceedings more than 14 years ago under a standard of proof requiring the government to demonstrate that the respondent-patients were mentally ill by a "preponderance of the evidence." In 1973 our Circuit Court declared that standard of proof unconstitutional and raised the government's evidentiary burden in civil commitment cases to that of "beyond a reasonable doubt." *In re Ballay*, 482 F.2d 648 (D.C.Cir.1973). Six years later, the Supreme Court struck down the "preponderance of evidence" standard and imposed a reduced standard of "clear and convincing" evidence. *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The District of Columbia Court of Appeals, in response to the Supreme Court's pronouncement in *Addington,* lowered the standard for this jurisdiction consistent with that announced in *Addington. In re Nelson*, 408 A.2d 1233 (D.C.1979).

Despite the Supreme Court's determination that the "preponderance" standard was unconstitutional, none of the civilly committed patients confined before 1973 have ever secured judicial review to determine whether or not the evidence which supported their initial commitment under the "preponderance" standard would be sufficient to support confinement under the new constitutional standard. In fact, none of these patients has ever received *any* form of judicial review since their initial commitment prior to 1973.

Concerned that patients may have been inappropriately committed and denied their liberty without a real and meaningful opportunity for judicial review, counsel from the Mental Health Law Project and the Public Defender's [2] office instituted this class action proceeding seeking declaratory and other equitable relief on behalf of all patients committed prior to 1973. Named as defendants were William Prescott, M.D., Superintendent of St. Elizabeths and Marion Barry, Mayor of the District of Columbia. Plaintiffs Alma Streicher and James McDonald, individually and as class representatives, seek a declaratory judgment that all such patients committed before 1973 under an unconstitutional standard of proof are entitled to judicial review of their commitment status according to the constitutionally required "clear and convincing" evidentiary standard.[3] Their demand for relief requires the Court to determine first, whether these patients were deprived of their liberty interests because they were committed under an unconstitutional standard of proof, and second, whether the patients' rights to due process necessitate new judicial hearings.

This Court concludes after review and consideration of the authorities relied upon and arguments advanced by counsel for the parties, that these patients, all of whom have been detained and forcibly residing in St. Elizabeths for more than 14 years, are entitled to judicial review of their present

---

This Act established a mechanism for transferring all responsibilities for the provision of mental health services to the residents of the District from the federal government to the local government by October 1, 1987. *See also* H.Rep. No. 1024, 98th Cong.2d Sess. (1984), U.S.Code Cong. & Admin.News 1984, p. 5810. In enacting the statute, Congress concluded that establishing a comprehensive mental health care system for local residents administered solely by the District would improve the efficiency and effectiveness of providing care to those mentally ill. *Id.* at 225(a)(6). By 1991 the District is required to operate a high quality, cost effective system which offers a continuation of inpatient and outpatient care and satisfies the patient's legal rights and medical needs. *Id.* at 225(b)(1).

**2.** The Mental Health Law Project is a public interest law firm devoted to defending the legal

rights of the mentally ill. The Public Defender Service provides counsel for indigent mentally ill patients and staffs an office at St. Elizabeths.

**3.** The potential number of patients who may have been erroneously confined is vast. During the initial discovery phase, plaintiffs reviewed the records of 10 percent of the patient population. Out of the 89 patients whose records were reviewed, 52 or almost 60 percent were committed before 1973. Forty-six of these patients or greater than 50 percent were committed before 1965 under the Ervin Act's predecessor statute which was enacted in 1939. According to the information revealed during discovery, none of these patients have had any form of judicial review of their commitment status. *See* note 17, *supra.*

commitment status under prevailing constitutional standards.

## I. BACKGROUND

The public interest groups originally instituted this class action in 1983 on behalf of *all* patients involuntarily committed to St. Elizabeths, for greater than six months. In their original petition for relief, plaintiffs sought a declaration from the Court that each patient was constitutionally entitled to automatic judicial review of his/her commitment at six month intervals.[4] Earlier in this proceeding, the named defendants as officials of the hospital sought summary judgment arguing that existing review procedures were more than adequate to satisfy the patients' constitutionally mandated due process rights. Defendants' motion was denied upon a finding that genuine questions of material fact were present regarding the adequacy of the review procedures for patients committed under appropriate constitutional standards.

At the same time, plaintiffs' counsel indicated they intended to submit a motion for partial summary judgment on behalf of all patients who were committed before 1973 under standards now held unconstitutional. That motion is presently before this Court, and plaintiffs seek partial summary judgment on behalf of all such patients.

Plaintiffs have identified two subclasses of patients whose commitment decisions they claim are constitutionally suspect. The first includes all patients committed before 1973, when, as previously noted, our Circuit Court declared the "preponderance" standard unconstitutional. The second subclass, a subset of the first, comprises all patients who were committed before 1965 when Congress enacted the Hospitalization of the Mentally Ill Act, codified at 21 D.C. Code 501 *et seq.* (1981) (hereinafter cited as the Ervin Act).[5]

Plaintiffs' motion presents purely legal questions appropriate for partial summary judgment. They argue first that the standard of proof enunciated in *In re Ballay*, and *Addington, supra,* should be applied retroactively, and thus, all patients committed under the prior "preponderance of evidence" standard would be entitled to a new hearing under the prevailing "clear and convincing evidence standard." In the alternative, plaintiffs contend that their commitment under an unconstitutional standard constitutes a denial of liberty without due process of law. They maintain that the fifth amendment due process clause entitles them to an automatic judicial review of their original commitments under current constitutional standards. Finally, they argue that the equal protection clause entitles patients committed under the Ervin Act's predecessor to a new commitment hearing with all the procedural rights guaranteed under that Act.

Plaintiffs contend that their initial hearings were conducted under standards which created an unconstitutionally high risk of erroneous commitment and that existing review procedures are insufficient to protect their liberty interests. They propose that *judicial* review of their commitment, conducted according to current constitutional standards would correct any prior erroneous commitment decisions. Further, they argue that judicial review is in

---

**4.** Plaintiffs specifically challenge the constitutionality of the indeterminate civil commitment provisions set out in the D.C. Hospitalization of the Mentally Ill Act, 21 D.C.Code § 501 *et seq.* enacted in 1965. *See* fn. 5.

**5.** The Ervin Act was enacted in 1967 to provide civil committees essential procedural and substantive protections. For example the Act insures that an individual facing commitment has a right to a judicial hearing together with a right to counsel. D.C.Code 21–525 & 21–543.

Although the Act has greatly enhanced the procedural protections accorded potential committees, its provisions do not dispose of and resolve plaintiffs' request for relief. The Act

does not entitle patients to an automatic judicial review of their commitment status. Furthermore, the patient is only entitled to counsel in a judicial proceeding and does not have a right to counsel when seeking review through the statutorily-available review procedures before the hospital or an independent psychiatrist. In re Holmes, 422 A.2d 969 (D.C.App.1980). Finally, the Act does not set forth the appropriate standard of proof necessary for commitment. These issues have been left to the courts to resolve. *See* Note, Procedural Safeguards of the Mentally Ill in the District of Columbia, 28 Catholic L.Rev. 855 (1982).

the interests of the District of Columbia as well since it has no interests in continuing unnecessary commitments, because confinement in St. Elizabeths is far more costly than outpatient care.[6] Finally, they argue that unlike the case of the criminal defendant, confinement of the mentally ill does not serve any deterrent or retributive goals. The District's interests in detaining an allegedly mentally ill person cease when the purpose for the detention no longer exists.[7]

Defendants oppose a retroactive application of *Addington* arguing that such a principle should not be applied to afford patients a commitment hearing under the new standard. They also maintain that the patients' substantive liberty interests are adequately protected by the existing review procedures.

Defendants argue that the existing Hospital review procedures, coupled with the opportunity for judicial review, would have corrected and resolved any prior erroneous commitment decisions and, thus render automatic review unnecessary. Moreover, automatic judicial review for the approximately 600 patients confined prior to 1973 would impose excessive and costly administrative burdens upon a system already too overburdened with merely trying to provide substantive care for both in-patients and out-patients.

## II. ANALYSIS

### A. Standards for Due Process and Retroactivity

In the context of this proceeding, due process is a flexible concept. The court is required to balance the value of the patients' liberty interests and the risk of their erroneous commitment against the government's interests in conserving fiscal and administrative resources. *Mathews v. El-*

*dridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

The retroactivity inquiry is also flexible, resting on the nature and purpose of the newly enunciated constitutional principle. The Supreme Court has suggested a three-pronged test to determine whether a new constitutional doctrine should be applied retroactively: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards." *Brown v. Louisiana*, 447 U.S. 323, 328, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980); *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967).[8]

Plaintiffs' application for partial summary judgment treats the right to due process and the right to retroactive application of newly articulated constitutional rules distinctly as separate bases for relief. The two inquiries converge when evaluating whether a decision based on a due process analysis should be applied retroactively. Once a court rules that due process requires the state to provide enhanced procedural protections before it can deprive an individual of her liberty or property, the relevant retroactivity inquiry devolves into a determination whether the individual's rights to due process are weighty enough to demand retroactive application of the new rule. At this point, the due process inquiry informs the retroactivity question. Both require the courts to weigh the individual's liberty interests and the risk of erroneous commitment against countervailing burdens on the state. Since plaintiffs' request for judicial relief collapses the relevant due process inquiry and retroactivity question, the Court will treat the inquiries as one.

---

**6.** As of May 1984, the costs of inpatient care at St. Elizabeths averaged $215 per day or $78,475 per year. Plaintiffs' habeus corpus petition at 17 (May 1984).

**7.** *See* Note, Procedural Safeguards for Periodic Review: A New Commitment to Mental Patient's Rights, 88 Yale L.J. 850, 862 (1979).

**8.** These factors are not accorded equal weight. The Court gives controlling significance to the first factor, the purpose of the new constitutional rule. *Desist v. United States*, 394 U.S. 244, 249, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969).

## B. Patients' Liberty Interests

The confinement in a mental institution has been aptly recognized as constituting "a massive curtailment of liberty." *See Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Former Chief Justice Burger equated commitment with incarceration, when he noted "there can be no doubt that involuntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the state cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger C.J. concurring). In a notable dissent, Justice Brennan eloquently described in *Jones v. United States,* the liberty interests at stake arising from an involuntary commitment to a mental institution:

> In many respects, confinement in a mental institution is even more intrusive than incarceration in a prison. Inmates of mental institutions, like prisoners, are deprived of unrestricted association with friends, family and community; they must contend with locks, guards and detailed regulation of their daily activities.... The treatments to which he may be subjected include physical restraint such as straightjacketing, as well as electroshock therapy, aversive conditioning, and even in some cases psychosurgery.... We should not presume that he lacks a compelling interest in having the decisions to commit him and to keep him institutionalized made carefully, and in a manner that preserves the maximum degree of personal autonomy.

463 U.S. 354, 385–86, 103 S.Ct. 3043, 3060–61, 77 L.Ed.2d 694 (1983).

The fact that many of the class plaintiffs residing in St. Elizabeths have been confined for 20 years or more does not diminish the importance of their liberty interests or render these interests conditional. Their confinement under an unconstitutional standard casts suspicion on the propriety and accuracy of that *original* decision when the patients were free and not yet constrained by the state. At that time their liberty interests were paramount.[9] Unlike the parolee in a criminal case whom the state has already found guilty of a crime—a finding which justifies imposing extensive restrictions on the individual's liberty, *Morrissey v. Brewer,* 408 U.S. 471, 483, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972)—the plaintiffs have never been adjudicated mentally ill under a constitutional standard.[10]

The Supreme Court has underscored the important liberty interests of the mentally ill emphasizing their rights to remain free unless adjudicated to be mentally ill in accordance with appropriate constitutional standards. In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), substantive limitations were imposed on the states' power to confine the mentally ill. The Court held that the nature and duration of commitment must bear some reasonable relation to the purpose for which the individual was committed. *Id.* at 738, 92 S.Ct. at 1858. An elaboration on this position was seen in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) where the Supreme Court held that "even if the original confinement was founded upon a constitutionally adequate basis, it could not constitutionally continue after that basis no

---

**9.** The Supreme Court has affirmed the importance of the patients' liberty interests even after they are committed according to current constitutional procedures. *See Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982), where the Court, at 316, forcefully stated that the right to freedom from bodily restraint is the core of one's liberty interest which necessarily survives involuntary commitment.

**10.** The patients' status is also distinguishable from that of patients in *Jones v. U.S.,* 463 U.S.

354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) who had already been determined mentally ill in a criminal trial. The court in *Jones* concluded that an insanity aquittee's liberty interests are diminished once he is adjudicated insane in a criminal trial. However the plaintiffs in this proceeding are all civil committees who have never been adjudicated mentally ill in a prior proceeding. They face the *first* deprivation of their liberty interests at their commitment hearing.

longer existed." *Id.* at 575, 95 S.Ct. at 2493.

Several state courts have interpreted *O'Connor* to require automatic judicial review so as to assure a continued legal basis for commitment. *State v. Fields,* 77 N.J. 282, 390 A.2d 574, 581 (1978); *Fasulo v. Arafeh,* 173 Conn. 473, 378 A.2d 553 (Conn. 1977). This Court need not reach the issue at this time of whether a person committed under *appropriate* standards is entitled to automatic periodic review. However, the Supreme Court's determination that a person's right to liberty necessarily restricts a state from confining that individual when his or her condition no longer satisfies the legal standard for the initial commitment, casts doubt upon the state's power to continue to confine a person who was committed under an unconstitutional standard of proof. At a minimum, the patients have very strong liberty interests which weigh heavily in the balance towards entitling those committed under *unconstitutional* standards to judicial review under the new constitutional standards in order to redress any potential wrongful deprivation of their freedom.

## C. The Preponderance Standard Creates an Impermissibly High Risk of Erroneous Commitment

The second factor of the due process analysis requires the Court to evaluate whether commitment under the "preponderance" standard created an unacceptable risk of inappropriate confinement which can only be remedied by affording the patients review under the current "clear and convincing" standards. *Addington* itself stands for the proposition that the preponderance of the evidence standard produced an impermissibly high risk of erroneous commitment. The Supreme Court reconfirmed the important liberty interests of the involuntarily confined—interests which

were not adequately protected under the then existing "preponderance" standard and concluded that a patient's due process rights required the state to prove the need for commitment by a more rigorous standard so as to "minimize the risk of erroneous decisions." *Id.* 441 U.S. at 425, 99 S.Ct. at 1809. The Court held that "the standard of proof reflects the value society places on individual liberty" *id.* at 425, 99 S.Ct. at 1809, and its tolerance for error in the fact-finding process, and further determined that it was inappropriate to ask "the individual ... to share equally with society the risk of error." *Id.* at 427, 99 S.Ct. at 1810.

In the field of criminal procedure, when a standard of proof has been rejected because it created an impermissibly high risk of erroneous commitment, the new standard has been applied retroactively to afford defendants committed under the old standard review under current standards. *Brown v. Louisiana,* 447 U.S. 323, 328, 100 S.Ct. 2214, 2219–20, 65 L.Ed.2d 159 (1980). A prisoner's right to due process require adjudication under the appropriate constitutional standard of proof. "Due process commands that no man shall lose his liberty unless the government has borne its burden of ... convincing the fact finder of his guilt. To this end, the reasonable doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue'." *Reed v. Ross.,* 468 U.S. 1, 5, 104 S.Ct. 2901, 2904, 82 L.Ed.2d 1 (1984) (holding the requirement that the state bears the burden of proving defendants' malice applies retroactively to defendants seeking a collateral appeal on a habeas corpus motion).[11]

While the Supreme Court has not directly addressed whether constitutionally mandated changes in standards of proof should be applied retroactively in civil proceedings,

---

**11.** Following similar reasoning, the court has retroactively applied changes in the standard of proof in several other criminal cases. *See Hankerson v. North Carolina,* 432 U.S. 233, 241, 97 S.Ct. 2339, 2344, 53 L.Ed.2d 306 (1977) (the requirement that government bears burden of proof shall have retroactive effect to defendants on direct appeal); *Ivan V v. City of New York,*

407 U.S. 203, 204, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972) (change of burden of proof has retroactive application); *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (a juvenile's due process interests required the state to prove delinquency beyond a reasonable doubt).

the reasoning developed in the criminal field to protect the liberty interests of potential convictees should apply with equal force to protect such interests of potential civil committees.

Accordingly, several courts have granted civil committees the same procedural rights guaranteed to criminal defendants. Concluding that involuntary commitment constitutes a significant deprivation of liberty which the state cannot accomplish without due process of law, these courts have conferred and extended the type of relief that the plaintiffs here seek. Thus other federal courts have provided civil committees with new hearings recognizing and deferring to prevailing constitutional standards. *Dorsey v. Solomon,* 604 F.2d 271, 275 (4th Cir.1979) citing *Addington v. Texas,* 441 U.S. at 428, 99 S.Ct. at 1810–11. The *Dorsey* trial court had no difficulty in finding that civil committees had a constitutional right to a judicial hearing with an appointed counsel. That court readily concluded that those rights were basic to the truth finding function and gave full retroactive effect to the underlying constitutional principles. *Dorsey v. Solomon,* 435 F.Supp. 725 at 740 (D.Md.1977).[12] Similarly in *Clark v. Cohen,* 613 F.Supp. 684 (E.D.Pa. 1985), *aff'd,* 794 F.2d 79 (3rd Cir.1986), after concluding that the change in the constitutional standard destroyed the legal basis for the original commitment, the district court ruled that, at a minimum, due process required that those committed under the unconstitutional standard were en-

titled to have their status reviewed under the new constitutional standard. *See also Heryford v. Parker,* 396 F.2d 393, 395 (10th Cir.1968); *Doe v. Gallinot,* 486 F.Supp. 983 (C.D.Cal.1979).

Defendants' attempt to distinguish the above cases from the present is unconvincing. They argue that *Dorsey, Clark,* and *Heryford, supra* stand for the proposition that retroactive application is appropriate only when courts adopt principles of great constitutional magnitude. They contend that *Addington* does not present such a case. Defendants imply that the right to be adjudicated according to the appropriate standard of proof is a less significant constitutional right which does not taint the accuracy of the prior decisions. They also assert that the change itself from "preponderance" to "clear and convincing" is a minor modification and does not implicate the accuracy of decisions made according to the original standard.

Defendants offer no support for their attempt to establish a hierarchy of constitutional rights. Every individual has a right to his or her liberty safeguarded by *all* the procedural protections mandated by the fifth amendment. The requirement that the state prove mental illness by "clear and convincing" evidence is as important to the accuracy and truth finding function of the proceeding as a patient's right to counsel or their right to notice. By its very decisions applying new evidentiary standards retroactively, the Supreme Court underscored the importance of such

---

**12.** Although the Fourth Circuit modified the trial court's order for relief, it explicitly premised its modification on the lower court's finding that providing plaintiffs with the right to request a hearing would automatically entitle them to counsel. Counsel would be fully knowledgeable about both the factual and legal developments in each particular case and accordingly would request a recertification hearing if appropriate. 604 F.2d at 275 (relying on 435 F.Supp. at 740 n. 15). *See also In re Roger S.,* 19 Cal.3d 921, 141 Cal.Rptr. 298, 569 P.2d 1286 (1977) (granting juveniles the right to a commitment hearing satisfied due process since every minor was automatically assigned a public defender who would assist them in the preparation and filing of a habeas corpus petition).

In this jurisdiction, affording plaintiffs the right to a hearing to review their commitment status would not automatically entitle them to counsel. Unlike Maryland's provisions for insanity acquittees and California's provisions for juveniles, the District of Columbia does not entitle civil committees to representation throughout the full period of commitment. Nor does the Ervin Act entitle patients to counsel when seeking a review of their status by the hospital administrators or independent psychiatrists. *See In re Holmes,* 422 A.2d 969 (D.C.App.1980). However, once entitled to *automatic* judicial review of their status, the plaintiffs would presumably be assigned a lawyer under D.C.Code 21–543 who, in turn, would help each plaintiff evaluate whether he or she has been wrongfully confined and should pursue a full blown hearing to obtain release.

standards. It has stated that applying the appropriate constitutional standard of proof was "essential for the protection of life and liberty." *See In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). A determination of the constitutionally appropriate standard of proof in civil commitment proceedings should not be accorded less weight than other constitutional principles.

Defendants' argument that the Court's adoption of the intermediate standard rather than the more rigorous "beyond a reasonable doubt" standard reduces the likelihood of erroneous decisions is also unpersuasive. In fact, the Supreme Court's recognition of the difficulty involved in determining when one is mentally ill supports the opposite conclusion—that erroneous decisions are *more* likely under the unconstitutional "preponderance" standard.

The Court selected the intermediate "clear and convincing" standard as a compromise between protecting the individual's liberty interests against wrongful confinement and safeguarding society's interests in confining those individuals who pose a threat to themselves or others. Given the subjective nature of ascertaining mental illness,[13] the Court concluded that both the lower "preponderance" standard and the higher "beyond a reasonable doubt" standard, overvalued one interest at the expense of the other. Hence the Court rejected both of these standards precisely because either one would result in an im-

permissibly high risk of erroneous decisions.

Finally, defendants suggest that our Circuit would be disinclined to apply the *Addington* standard retroactively. In support of this bold claim, they cite *Bolton v. Harris*, 395 F.2d 642 (D.C.Cir.1968), where the court gave *prospective* effect to its ruling that insanity aquittees could not be automatically confined without a civil commitment hearing. Defendants argument is unconvincing. The *Bolton* court analyzed the retroactivity issue only in a cursory fashion. Moreover, *Bolton* was decided before the major Supreme Court cases that underscored the liberty interests of civil committees and accorded them the protections provided criminal defendants.[14] *E.g.*, *O'Connor*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) and *Jackson*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).[15]

Defendants' attempt to marginalize the Supreme Court's holding in *Addington* as an unimportant, trivial shifting of the standard of proof is undermined by the force of the decision itself. These patients who have been residing in St. Elizabeths since 1973 were committed under the same standards overturned in *Addington*. The risk that their commitment decisions were erroneous is indistinguishable from that facing the plaintiff in *Addington*. Therefore this Court concludes that the risk that these plaintiffs have been erroneously confined for 14 years or more is constitutionally intolerable. They are entitled to a review

---

**13.** As Chief Justice Burger noted in the *O'Connor* opinion, "there can be little responsible debate regarding the uncertainty of diagnosis in this field and the tentativeness of professional judgment." 422 U.S. at 584, 95 S.Ct. at 2498.

**14.** Moreover the court in a subsequent opinion *Waite v. Jacobs*, 475 F.2d 392 (D.C.Cir.1973), cast doubt on the decision not to give *Bolton* retroactive effect.

**15.** Furthermore defendants ignore our Circuit's equally strong tradition in valuing the civil committees' liberty interests and according patients their full procedural protections. It was this Circuit which determined that due process required that the state must prove mental illness beyond a reasonable doubt. *In re Ballay*, 482 F.2d 648 (1973). The court's forceful rejection

of the state's claim of mootness in that case, bears repeating to illustrate the elevated importance this Circuit has placed on a committee's liberty interests. Defendants sought to dismiss the proceeding as moot because the plaintiff had already been committed twice. Defendants contended that these prior commitments were proof that Bolton was clearly insane and would not benefit from a rehearing. In rejecting the district court's argument, the court stated "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication." *Id.* at 653 (quoting *Sibron v. New York*, 392 U.S. 40, 56, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968)).

of their commitment according to current constitutional standards.

## D. Existing Review Procedures Do Not Protect Patients' Liberty Interests

Even if the original commitment decisions could not be sustained under the prevailing constitutional standard, defendants contend that the existing review procedures would have corrected any prior erroneous decisions. Therefore, they argue *judicial* review is unnecessary. Plaintiffs vehemently disagree and argue that existing review procedures are inadequate to remedy prior mistakes and safeguard patients' due process rights.

To satisfy due process, the existing review procedures must be tailored to the capacities and circumstances of those whose interests are at stake and are to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). The Ervin Act offers two avenues for review of a commitment decision. The first is patient-initiated. Under this alternative a patient has the right to request independent psychiatric evaluations at the Hospital's expense. D.C.Code 21–546. If any one of the evaluations results in a conclusion that the patient is not mentally ill to the extent that he is likely to injure himself or other persons if not committed, and the facility still will not authorize release, the patient may petition for court review. *Ibid.* The second is a hospital-initiated review. Under this alternative the Hospital staff is required to examine all patients, including plaintiffs, at least every six months to determine whether "the conditions which justified the involuntary hospitalization of the patient no longer exist." *Id.* 21–548. Finally, habeas corpus is available to all patients committed under the Act. *Id.* 21–549.

For the patient-initiated review procedure to protect the patients' right to liberty and, accordingly, satisfy due process, the patients must be capable of exercising their rights to demand an independent psychiatric review or judicial review. Similarly, the internal hospital review panels must take into account changing legal standards when reviewing the patient's mental status in order to remedy any prior mistakes. Defendants have not offered any arguments or evidence showing that these review procedures are tailored to the special needs of the mentally ill to adequately protect their liberty interests.

The average patient residing in a mental institution is not capable of mastering the changing legal standards and developments in mental health law and evaluating how these changes might affect his or her rights. The effects of confinement, particularly the debilitating effects of the drugs routinely administered at mental institutions, present tremendous obstacles which limit the patients' abilities to utilize the review procedures and assert his or her rights. *See Fasulo v. Arafeh*, 173 Conn. 473, 378 A.2d 553 (1977); *State v. Fields*, 77 N.J. 282, 390 A.2d 574 (1978).[16] Moreover, according to the evidence developed during discovery, not one patient has exercised his or her rights to request review.[17] The very fact that no patient committed before 1973 has utilized the review procedures in the past 22 years raises serious doubts about their abilities to invoke these procedures.

If the patient-initiated review process does not adequately protect the plaintiffs' due process rights, the hospital-initiated re-

---

**16.** These cases evaluated the propriety of patient-initiated review of commitment decisions which were conducted according to appropriate constitutional norms. Hence the patients in these cases were afforded a constitutionally adequate determination that they were mentally ill. However in this proceeding where the patients are challenging the propriety of the original commitment decisions, the patients' liberty interests are even stronger, and the concern over the patients' capabilities is heightened.

**17.** When asked how many patients had availed themselves of either the patient-initiated review procedures under 21 D.C.Code 546 or the hospital-initiated review procedures under 21 D.C. Code 548, defendants identified only three individuals. According to these patients' identification numbers, plaintiffs noted that they were committed after 1973 and are not part of either subclass. *See* Response of Federal Defendant to Interrogatory 4 of Plaintiffs' First Set of Interrogatories.

view is no better. That review process is conducted internally without any of the procedural rights provided in a judicial hearing. Patients are not entitled to a lawyer, nor permitted to introduce relevant evidence relating to his or her recovery. *See* D.C.Code § 21–548. Moreover, doctors are not equipped to analyze the legal basis of the patients' commitment. Several empirical studies have proven that the psychiatrists are inherently biased toward commitment and tend to favor treatment whenever considered needed. *See* B. Ennis & R. Emery, *The Rights of Mental Patients* (1978); S. Morse, A Preference for Liberty: The Case Against Involuntary Commitment of the Mentally Disordered, 70 Calif.L.Rev. 54, 86 (1982). The doctors' bias towards favoring treatment undermines the defendants' assertion that hospital review is an adequate substitute for the constitutionally conducted judicial hearing which plaintiffs have heretofore been denied.

Finally, the hospital does not keep the documentation necessary to conduct a thorough review which adequately safeguards these plaintiffs' liberty interests. Defendants admittedly had a difficult time retrieving the relevant information necessary to respond to plaintiffs' interrogatories. They stated that their hospital records did not include any information regarding whether patients had sought or received court review of their commitment. Response of Federal Defendant to Interrogatory 9 of Plaintiffs' First Set of Interrogatories. (Jan. 30, 1985.) Doctor Myerson, plaintiffs' psychiatric expert, who reviewed the hospital records, exclaimed that the records which did exist were "woefully inadequate" and provided little basis on which to measure whether the patient had improved and could benefit from less restrictive care. Affidavit of Arthur T. Myerson, M.D., para. 4. (Oct. 28, 1985.) It seems incredulous that the hospital asserts, on the one hand, that its in-house procedures thoroughly examine both the medical and legal criteria of continued commitment and hence satisfy due process, and on the other, that it maintains no records of a patient's court review.[18] It appears to this Court that the existing procedures are woefully lacking and insufficient to satisfy plaintiffs' due process rights.

### E. Burden on the District's Resources is not Excessive

The potential burden of conducting commitment hearings is not substantial enough to surmount the plaintiffs' liberty interests. The anticipated burden to conduct approximately 600 hearings is overstated and not as onerous as it appears at first blush. First, the hearings do not have to be conducted immediately. They can be scheduled over a specified period of time thus reducing the strain on the hospital and the courts. Furthermore, once plaintiffs are entitled to automatic review, they will be granted counsel who can review each patient's condition according to current legal standards and determine if a full hearing is appropriate. Presumably, many patients, upon advice of counsel, will waive their right to a hearing. Therefore, the total number of comprehensive adjudicatory proceedings will be far fewer than the maximum potential of 600. *See supra* note 12.

In effectuating the plaintiffs' rights to due process, Justice Harlan's admonition should be recognized—"budgetary inadequacies should not be permitted to stand in the way of ... otherwise sound constitutional principles." *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 411, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971). Accordingly, this Court concludes that the plaintiffs' liberty interests coupled with the risk of erroneous commitment outweigh the District's concern with increased administrative burdens.

### F. Class of Patients Entitled to Automatic Review

Today's ruling that patients committed under an unconstitutional standard of

---

**18.** This is not the first time the courts have scolded St. Elizabeths for failing to keep adequate records. *See Dixon v. Jacobs*, 427 F.2d 589, 597 (D.C.Cir.1970). Adequate documentation would have enabled this Court to better assess the adequacy of the hospital's in-house review process and determine whether the existing procedures satisfy due process.

proof are entitled to a judicial hearing applies to all patients in the relevant subclasses. Defendants contention that those individuals who waived their right to a judicial hearing are not entitled to a judicial reexamination of their commitment status ignores the elementary requirements necessary for a valid waiver. Waivers are only valid if knowingly and intelligently made and approved by the court. *In re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1966); *Suziki v. Quisenberry*, 411 F.Supp. 1113, 1129 (D.Haw.1976). The court must independently approve the waiver and affirm the Mental Health Commission's report according to the prevailing constitutional standard of proof. *In re Nelson*, 408 A.2d 1233 (D.C.1979). However in all decisions prior to 1973, patients were deciding whether to waive their rights based on the unconstitutional "preponderance" standard. This Court is not empowered to speculate whether these individuals would have waived their right to trial if they knew the state had to prove their mental illness by "clear and convincing" evidence. Their waivers cannot be considered knowingly and intelligently made according to current constitutional standards. Each patient with the advice of counsel should have the opportunity to reevaluate his or her decision according to the appropriate standard and obtain proper approval by the courts.

## G. Right to Judicial Review for Patients Committed Before 1965

Plaintiffs' rights to due process entitle them to judicial review of their commitment and fully satisfy their request for relief for members of both subclasses. Therefore, the Court will refrain from analyzing the constitutionality of the now-defunct predecessor to the Ervin Act.[19]

## CONCLUSION

The Supreme Court in *O'Connor* recognized the dilemma faced by society in deciding how to properly care for the mentally ill. It noted that releasing an unprepared patient onto the community often does not improve the patient's living standards or enhance his or her freedom.[20] However, the decision today is not adding to the crisis of the de-institutionalized. An entitlement to judicial review does not mean an entitlement to automatic release but only a review to determine if each plaintiff's commitment is consistent with existing constitutional standards. Nor is this Court intervening in the therapeutic judgments of the medical profession. Courts should readily defer to a physician's clinical judgments as to appropriate treatment. *Youngberg v. Romeo*, 457 U.S. 307, 322, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982). But, by rigorously guaranteeing the mentally ill's procedural rights, courts can help insure that the commitment decision will

19. However, it is important to note that the Ervin Act was enacted specifically to redress the constitutional infirmities of its predecessor. Although the statute has never been struck down, several courts have questioned its constitutionality. *See Matter of Brown*, 68 F.R.D. 172, 177 (D.D.C.1975); *Bension v. Meredith*, 455 F.Supp. 662 (D.D.C.1978). The old law failed to provide many of the procedural rights deemed constitutionally necessary by courts. It only provided for a qualified right to representation at the discretion of the court. Other courts have held similar provisions unconstitutional concluding that patients have a constitutional right to counsel. *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala. 1974) rev'd on other grounds, 651 F.2d 387 (5th Cir.1981); *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972).

The statute is also suspect for its over-inclusive definition of the mentally ill. It merely provided for civil commitment of "the Insane" without incorporating any requirement that the

person be dangerous to him/herself or others. The Supreme Court held a similar statute unconstitutionally over-broad, concluding that a mere showing of insanity or mental illness without proof that a person was a danger to self or others was insufficient to involuntarily confine an individual. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

20. Presently St. Elizabeths is under a long-standing consent decree to provide appropriate health care in the least restrictive environment to all mental patients under the decree. *Dixon v. Weinberger*, 405 F.Supp. 974 (D.D.C.1975); (Civil Action No. 74–285). If a patient is determined to be improperly committed, the District is required to provide them with appropriate outpatient care. The requirements of the consent decree will prevent the District from discharging patients from the hospital, leaving them to fend completely for themselves.

**346**

actually advance society's therapeutic and protective goals.[21]

An appropriate Order will be entered.

### ORDER

Consistent with the Memorandum Opinion entered on this day, it is this 19th day of May, 1987,

### ORDERED

That plaintiffs' motion for partial summary judgment is granted. Counsel for the parties shall confer immediately and arrange a mutually agreeable schedule for the hearings. If counsel are unable to reach agreement, plaintiffs' counsel shall submit an appropriate order with a proposed hearing schedule, by June 8, 1987.

---

**21.** *See,* C. Stromberg & A. Stone, A Model State Law on Civil Commitment of the Mentally Ill, 20 Harv.J. on Legisl. 275.